UNITED STATES of America

v.

Jose PENALO, a/k/a "Jose Cruz", and
Daniel Enrique Mena, Defendants.

No. 79 CR 158.

United States District Court,
E. D. New York.

June 11, 1981.

Edward R. Korman, U. S. Atty., E. D. N. Y. by Winstanley F. Luke, Asst. U. S. Atty., Brooklyn, N. Y., for plaintiff.

David Segal, New York City, for defendant Penalo.

Harry C. Batchelder, Jr., New York City, for defendant Mena.

### MEMORANDUM AND ORDER

NEAHER, District Judge.

On the morning of March 8, 1979, defendants Jose Penalo and Daniel Mena were

**1044**

arrested at LaGuardia Airport in Queens, New York, following the discovery of more than a pound of cocaine in a suitcase claimed by Mena. The two had arrived at LaGuardia on a flight from Miami, Florida, and were questioned, and subsequently arrested, after an investigatory "stop" made by agents of the Drug Enforcement Administration (DEA). Defendants moved to suppress the tangible evidence seized and the statements they made to the agents, and a hearing was held concerning the events preceding their arrest. Based on the following findings of fact and conclusions of law, the motions are denied.

On the morning in question, DEA Special Agent Robert K. Sears, with his partner Special Agent Alfredo Iglesias, established surveillance at the Eastern Airlines Terminal at LaGuardia awaiting the arrival of flight 892 from Miami. At that time, Sears had already had seven and a half years experience as a DEA agent which included more than a year detailed to LaGuardia. Positioning himself opposite the "jetway" for deplaning passengers, Sears observed defendant Mena walk at a rapid pace along the passengers' hallway approximately 45 feet into the terminal and then abruptly stop. Mena then turned around and for several moments stared at the people seated nearby in the outgoing passengers' area and at those passengers behind him who were also deplaning from flight 892. Also turning to view those coming off flight 892, agent Sears observed defendant Penalo walk off the jetway. At that point, Penalo and Mena established eye contact, which they maintained as Penalo walked along the hallway towards Mena. When Penalo approached to within eight or ten feet of Mena, without either making any overt sign of recognition of the other, Mena turned around and proceeded forward toward the terminal exit. Penalo followed, approximately eight to ten feet behind, quickening and slowing his pace to match Mena's. Agent Sears observed that "several times Mr. Mena looked back over his shoulder as if looking for surveillance." H 13.[1]

After they had proceeded a distance in this manner, Mena stopped, Penalo came up to him and the two engaged in a very brief conversation. They then separated with Penalo, after a short hesitation, proceeding towards the baggage claim area, and Mena walking over to a nearby bank of pay telephones. Without depositing any coins, Mena dialed a telephone number and put the receiver to his ear. Mena did not speak or move his lips, but stood holding the receiver and looking back at the people who were coming off the plane after him. After about a half minute's surveillance of Mena at the telephone, Sears proceeded to the baggage claim area where he observed Penalo. In a few moments Mena appeared, joined Penalo and the two again had a short conversation and then immediately separated.

At this point Penalo and Mena again engaged in a maneuver that Sears termed "follow the leader." H 16. For at least two minutes Mena walked "aimlessly" around the baggage area while Penalo followed his pattern and watched the people outside who could look back into the baggage area. Mena then went to the baggage carousel that held the luggage coming off flight 892 and approached a gray Samsonite suitcase. Reaching into his rear pocket, Mena withdrew a handkerchief and used it to grasp the handle of the suitcase. The two then gave their ticket stubs to security personnel and, with Mena carrying the suitcase as described above, passed through the terminal doors to the curbside taxi area.

Mena placed the suitcase on the sidewalk between himself and Penalo. Sears, now joined by agent Iglesias, observed the two from inside the terminal for approximately a minute. Sears testified that Mena turned around and appeared to be staring at the agents. At this point, Sears and Iglesias approached defendants and identified themselves as federal officers. Sears testified

---

1. Page references are to the transcript of the hearing on the motions to suppress held February 3, 1981.

that "at that time, Mr. Mena became extremely nervous. His jaw muscles seemed to tighten up, and his hands started to tremble." H 17.

Sears asked Mena if he had arrived on a flight from Florida, and Mena responded that he had. The agent requested identification and Mena produced a Florida driver's license and an Eastern Airlines ticket, both in his own name. At that point, Sears looked down and noticed that the airline identification sticker on the suitcase bore the name "Rafael Soto." In response to Sears' question whether the suitcase belonged to him, Mena stepped away from the luggage and said,

> "No, the bag doesn't belong to me. Check it out, check it out for my fingerprints." H 18.

In addition, Mena stated that Penalo had not arrived with him on the flight from Miami, but had come to the airport in a car to pick up Mena. Sears then conferred briefly with agent Iglesias, who had been speaking with Penalo. Penalo had stated to Iglesias that he had no identification and had come to the airport to pick up Mena.

At that point, the agents requested that Penalo and Mena step inside the terminal doors to a public area near a bank of telephones. The two complied and, although they were not so advised, Sears testified that at that time they were still free to leave. Sears then stated that he wished to search the suitcase but that he had no authority to do so without a warrant unless they gave their consent. In response to this, both Penalo and Mena repeated their denials of ownership and Mena took a step back, "as if to flee." H 23. Sears held his arm and escorted him to a less exposed yet still public hallway nearby. In the face of

defendants' reiterated statements that they knew nothing about the suitcase, Iglesias took a Samsonite passkey from his pocket and opened the bag. Upon the discovery inside of approximately 496 grams of cocaine, Penalo and Mena were placed under arrest and advised of their constitutional rights. All of the events from the moment the agents approached defendants at curbside until the opening of the suitcase transpired within the space of a few minutes.[2]

The Fourth Amendment requires that investigatory stops, such as the one involved here, be justified by specific and articulable facts which support a reasonable suspicion that the person stopped is engaged in criminal activity.[3] *United States v. Cortez,* —— U.S. ——, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Forero-Rincon,* 626 F.2d 218 (2d Cir. 1980). In elaborating the requirements of this standard, the courts have repeatedly stressed that the observations of law enforcement officers must be viewed as a whole, not as discrete and separate facts, in the final determination of whether they add up to a reasonable suspicion sufficient to uphold the stop. *United States v. Forero-Rincon, supra,* 626 F.2d at 221. See *United States v. Vasquez,* 612 F.2d 1338, 1342 (2d Cir. 1979), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2990, 64 L.Ed.2d 857 (1980); *United States v. Oates,* 560 F.2d 45, 61 (2d Cir. 1977). Indeed, the Supreme Court has most recently stated:

> "The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of

---

2. Although not necessary for the resolution of the issues presented by these motions, the Court relates the following remaining facts in the interest of completeness. After their arrest, Penalo and Mena were escorted to DEA offices at the airport. There they were searched and in Penalo's trousers pocket was found a Samsonite key that opened the gray suitcase. Sears testified that had Iglesias' key not opened the luggage, he would have obtained a skeleton key from one of the airlines,

which keep such keys for all major makes of luggage.

3. Since the government has not taken the position that defendants were not "seized" within the meaning of the Fourth Amendment, the Court assumes, *arguendo,* that a seizure occurred. But see *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 1875–78, 64 L.Ed.2d 497 (Stewart, J.), and 100 S.Ct. 1880 n. 1 (Powell, J., concurring) (1980).

which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

"The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

"The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *United States v. Cortez, supra*, 101 S.Ct. at 695.

Finally, the fact that certain conduct might be as consistent with innocence as with guilt does not preclude that conduct from supporting a trained agent's reasonable suspicion of criminal activity. *United States v. Forero-Rincon, supra*, 626 F.2d at 222.

■ Guided by these principles of law, the Court is of opinion that Special Agent Sears had developed a reasonable suspicion that defendants were involved in criminal activity. Sears' suspicion was based upon the following facts:

(1) Penalo and Mena arrived from a "source" city for cocaine.

(2) Mena walked off the jetway rapidly but then abruptly stopped and turned around to observe those following him.

(3) Penalo and Mena made eye contact but no other sign of recognition.

(4) Penalo walked up to within several feet of Mena and the two then proceeded in this configuration.

(5) On at least two occasions, Penalo and Mena spoke briefly and then separated, each time one following the other closely.

(6) Mena stood at a pay telephone with the receiver to his ear without having deposited coins and without speaking or moving his lips.

(7) Mena picked up the suitcase using a handkerchief to shield his hand and fingers from the surface of the handle.

(8) Penalo and Mena continually looked around and appeared to stare back upon noticing that they were being observed by the agents.

Viewing these facts as a whole and the rational inferences to be drawn from them, the Court concludes that they "did reasonably warrant the very minimal and brief intrusion upon [defendants'] security" which preceded the opening of the suitcase. *United States v. Price*, 599 F.2d 494, 501 (2d Cir. 1979). Even if the agents' "several observations, viewed singly, are of seemingly unexceptional behavior," when taken as a composite they reasonably supported the inference drawn by experienced agents that Penalo and Mena were acting in concert and seeking to evade detection of their association and its purpose.[4] *United States v. Forero-Rincon, supra*, 626 F.2d at 221–22. See *United States v. Vasquez, supra; United States v. Vasquez-Santiago*, 602 F.2d 1069 (2d Cir. 1979). Under these circum-

---

4. The instant case is different in this regard from *United States v. Buenaventura-Ariza*, 615 F.2d 29, 36 (2d Cir. 1980), where the Court found insufficient to uphold a stop the agents' testimony that defendants appeared nervous and glanced around and the "simple fact that they did not travel side by side and were not conversing while walking through the termi-

nal." In this case, the sum of the several specific and articulable facts outlined above constituted an "objective manifestation," *United States v. Cortez, supra*, 101 S.Ct. at 695, and not an agent's "subjective hunch," *United States v. Buenaventura-Ariza, supra*, 615 F.2d at 37, that defendants were engaged in criminal activity.

stances, the agents' suspicion reasonably justified their decision to approach defendants and make routine inquiries.

Nonetheless, defendants contend that the stop cannot be deemed reasonable because it was based upon a DEA drug courier "profile" which they assert is vaguely formulated and arbitrarily applied.

■ It is true that the presence of a number of elements of such a profile does not, in and of itself, necessarily satisfy the Fourth Amendment requirement that the intrusion be justified by specific and articulable facts. See *United States v. Price*, *supra*, 599 F.2d at 502 n.10; *United States v. Rico*, *supra*, 594 F.2d at 326. See also *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980).[5] Nonetheless,

> "it is appropriate for a court to take into account characteristics enumerated in the profile, which represents 'a kind of institutional expertness' derived from the cumulative experience of DEA surveillance teams." *United States v. Price*, *supra*, 599 F.2d at 502 n.10, *quoting*, *United States v. Rico*, *supra*, 594 F.2d at 326.

To the extent that the profile represents a distillation of years of DEA experience in law enforcement at airports, reference to it reflects "consideration of the modes or patterns of operation of certain kinds of lawbreakers" recently approved by the Supreme Court. *United States v. Cortez*, *supra*, 101 S.Ct. at 695.

■ In the final analysis, however, the Court "cannot be bound by a profile developed by the law enforcement officers whose actions are being reviewed." *United States v. Price*, *supra*, 599 F.2d at 502 n.10. Ultimately, the constitutionality of a stop will be upheld only if the Fourth Amendment's requirements, as elaborated in the cases discussed above, are satisfied.[6]

It was Sears' testimony that the stop in this case was not made in reliance on some standardized DEA "profile." H 46, 54. Rather, he testified that he based his decision upon observed behavior which alerted him that "the subject's actions and activities at the airport stands [sic] out from the other travelers which I have observed over the months and years I've been assigned to the airport." H 52. In any event, whether or not Sears

> "consciously used the 'profile' as a frame of reference as he watched [defendants], he saw and convincingly described conduct that in aggregate warranted a man of reasonable caution in believing that it was appropriate for him to identify himself to [defendants] and ask them to produce their tickets and some identification." *United States v. Rico*, *supra*, 594 F.2d at 325.

Since, as the Court's discussion above indicates, the government has carried its burden of showing that the stop in this case was independently justified by specific and articulable facts, we need not inquire further into claims of inconsistencies or improprieties in a "profile" allegedly used by DEA agents in other cases.

■ Since the initial stop was reasonable under all the circumstances, the agents could then conduct a limited investigation into the bases for their suspicion. *Terry v. Ohio*, *supra*, 392 U.S. at 23, 88 S.Ct. at 1881; *United States v. Vasquez-Santiago*, *supra*, 602 F.2d at 1072. The agents' original suspicions were heightened by defendants' apparent nervous behavior and the fact that a third party's name appeared on the suitcase's identification sticker. In response to inquiries, defendants then denied ownership or even knowledge of the suitcase that Mena had retrieved from the baggage carousel. See *United States v. Price*, *supra*, 599 F.2d at 498 n.3. In addition, both Pena-

---

**5.** See generally, Costantino, *Drug Courier Profiles and Airport Stops: Is the Sky the Limit?*, 3 Western New England L.Rev. 175 (1980). See also *United States v. Westerbann-Martinez*, 435 F.Supp. 690 (E.D.N.Y.1977).

**6.** Indeed, in *United States v. Rico*, 594 F.2d 320 (2d Cir. 1979), where the elements of a "pro-

file" were *not* satisfied, the Court upheld the constitutionality of an airport stop upon an independent finding of satisfaction of the requirements of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny in this Circuit.

lo and Mena made the concededly false assertion that Penalo had come by car to pick up Mena. Finally, Mena's blurted out remark that agent Sears should check the bag for fingerprints "increased rather than allayed suspicion" in view of the manner in which he had previously grasped the suitcase. *United States v. Rico, supra*, 594 F.2d at 326. All these circumstances justified the agents' request that defendants step inside the terminal briefly where the matter could be pursued in a less open area. *United States v. Price, supra.*

With regard to the opening of the suitcase minutes later, the Court concludes that Mena consented to the search of the luggage.[7] In this regard, the government, of course, bears the burden of proving that the consent was freely and voluntarily given, since mere acquiescence to lawful authority or submission to coercion cannot validate a search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 228–29, 93 S.Ct. 2041, 2045, 2048–2049, 36 L.Ed.2d 854 (1973). Whether a consent was voluntary is a question of fact to be determined from the totality of all the circumstances. *Schneckloth v. Bustamonte, supra*, 412 U.S. at 227, 93 S.Ct. at 2047–2048.

In defendants' case, the stop itself and the questioning took place in public areas of the airport, see *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976), by officers in plain clothes. There was no pat-down and there is no indication that the agents made any display of authority greater than the showing of the pocket credentials. The tone of the questioning was apparently conversational and the entire encounter leading up to the opening of the suitcase lasted a brief matter of minutes. The record contains no suggestion, nor is there any claim, that defendants' age, education or intelligence handicapped them in any way during the interview. Defendants were plainly in-

formed by Sears that if they did not consent he would have to obtain a warrant before searching the luggage. Although not "the *sine qua non* of an effective consent," this advice of Mena's constitutional right is clearly a factor to be considered in determining the voluntariness of a consent. *Schneckloth v. Bustamonte, supra*, 412 U.S. at 227, 93 S.Ct. at 2047–2048. Although at one point Sears may have sought to prevent Mena from fleeing, it does not appear in the record, nor is it claimed, that this circumstance contributed to any undue pressures that might have influenced Mena's decision to allow a search of the bag. Furthermore, both defendants' repeated denials of ownership or knowledge of the suitcase were unambiguous and signified their consent to the search of the bag which had been in Mena's possession since before they were stopped by the agents. See *United States v. Price, supra*, 599 F.2d at 503. Viewing all the circumstances in their totality, the search of the suitcase pursuant to Mena's consent was valid.

Finally, defendants move to suppress the statements they made to the agents while standing at curbside on the ground that they had not been given warnings under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, such advices of rights are only required in cases of "custodial interrogation," which the *Miranda* Court specifically defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612.

Here, the statements were made in an open and public place during a very brief conversation. The agents' inquiries were simple and routine. The agents, who were in plain clothes, made no show of force. It is apparent that any nervousness defend-

---

7. Although no party has addressed the question, it does not appear that defendant Penalo, who continues to deny ownership of the suitcase that was, in any event, claimed by and in the possession of his co-defendant, would be able to carry his burden of showing that he was standing to object to the search of the suitcase. See *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

ants may have experienced was due not to the agents' conduct, but to their own consciousness of guilt and fear of discovery.

Moreover, Sears testified that at the time of the statements, defendants were free to leave. While it is true that a finding of custodial interrogation does not require a formal arrest and questioning at a police station, see *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), "police officers are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). Since the Court is unable to conclude that defendants' statements were the product of "custodial interrogation," no *Miranda* warnings were required and the evidence of the statements may not be suppressed.

Accordingly, the motions to suppress are denied.

SO ORDERED.