**UNITED STATES of America, Plaintiff,**

v.

**Curt Lee SCHUMACKER, Defendant.**

**No. 83 CR 146–1.**

United States District Court,
N.D. Illinois, E.D.

Dec. 20, 1983.

---

Dan K. Webb, U.S. Atty., Thomas M. Durkin, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Michael Monico, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

This matter is before the court on defendant's motion to suppress. The defendant asserts that he was stopped and searched by law enforcement officers at O'Hare Airport in violation of the Fourth Amendment, and that all evidence seized must be suppressed. The defendant argues that the encounter between the defendant and the law enforcement officers in this case was a seizure within the meaning of the Fourth Amendment, made without either a reasonable articulable suspicion of criminal activity or probable cause. The defendant further asserts that no consent was given for the search of the defendant's person. The government, on the other hand, asserts that the encounter with the defendant was a voluntary police-citizen encounter not implicating the Fourth Amendment.

An evidentiary hearing was held on the motion beginning on August 8, 1983. For the reasons set forth below, defendant's motion is denied.

## FACTS

At the hearing on the motion to suppress, three law enforcement officers testified on behalf of the government: Drug Enforcement Administration Agent Bob Fulkerson, and two Indiana police officers who were with Agent Fulkerson at the time of the seizure, Detective James Stout, of the LaGrange, Indiana Sheriff's Department, and Detective Robyn Wiley, of the Indiana State Police. Testifying for the defense were the defendant, Curt Schumacker, and the two young men who were with him at the time of the seizure, John Quinones and Michael Bogdamovic.

These witnesses gave testimony that conflicted on several crucial matters, requiring the court to make important credibility determinations for each witness. In judging the credibility of each witness and the weight to be given the testimony of each, the court has taken into account for each witness the intelligence, ability and opportunity to observe, the age, the memory, the manner while testifying, any interest, bias, or prejudice the witness may have, and the reasonableness of the testimony considered in the light of all the evidence in the case. The court has also reviewed its notes taken at the time each witness testified regarding their credibility.

Having heard the arguments of counsel, read the memoranda submitted to the court, reviewed the testimony of witnesses with the Court's detailed notes concerning the witnesses and the exhibits presented at the hearing, the court makes the following findings of fact:

On February 17, 1983, at approximately 3:10 p.m., Agent Fulkerson, working as a member of the Drug Enforcement Administration Task Force at O'Hare Airport, was awaiting the arrival of a flight from Fort Lauderdale, Florida. Agent Fulkerson, who had been working on the O'Hare task force for four years, testified that Fort Lauderdale is a major source city for drugs. Along with Agent Fulkerson at the terminal were two DEA Task Force Officers, and four Indiana detectives who Agent Fulkerson was training.

Before the flight arrived, Agent Fulkerson observed Michael Bogdamovic sitting in the boarding area looking around at other people. He looked at Agent Fulker-

son for a moment, and then went from the boarding area to a small alcove adjacent to the area.

At approximately 3:20 p.m., the flight arrived. Among the passengers who exited the plane were the defendant, Curt Schumacker, and John Quinones. The defendant was carrying a hang-up bag, while Quinones carried both a hang-up bag and a brief case. The two walked down the F-Concourse toward the main terminal at a slow pace. Bogdamovic joined them when they reached the alcove where he had been standing, and the three proceeded together down the concourse toward the main terminal at a slow pace. Agent Fulkerson and Detectives Wiley and Stout followed them. Both the defendant and Bogdamovic looked back over their shoulders in the direction of the officers on several occasions.

When the defendant, Quinones and Bogdamovic reached a short concourse connecting the E and F concourses, they turned and walked down the connecting concourse, to an area near some phone booths and washrooms. They stopped in front of the telephones, and stood approximately two feet away from them. This concourse was spacious, well-lit, open to the public, and people were passing through freely. A large number of people could be seen walking down both of the main concourses from where they stood.

Quinones squatted down and opened one of the bags on the floor. While he was looking inside the bag, Agent Fulkerson and Detectives Wiley and Stout walked up to them. The three officers stood opposite the three young men, a short distance away from them. The officers were not surrounding the young men, as the defendant testified. The young men could have walked away from the officers either to their right or to their left, or they could have walked between the officers.

Agent Fulkerson identified himself as a federal agent and showed them his badge. He identified Detectives Wiley and Stout as police officers. Agent Fulkerson then asked the three if he could talk to them. All three agreed to talk with him. Agent Fulkerson asked the defendant and Quinones, the two who had gotten off the plane, for some identification. Both produced driver's licenses with their names on them. The defendant asked Agent Fulkerson what the interview was about. Agent Fulkerson responded that they were not under arrest, but that he was conducting a drug investigation and would like to ask them a few questions.

Agent Fulkerson then asked the defendant and Quinones for their airline tickets. Quinones produced two tickets and handed them to Agent Fulkerson. The tickets appeared to have been issued to Mr. C. Quinones and Mr. J. Quinones.[1] Agent Fulkerson asked the defendant about the difference in the name on his ticket and his driver's license. The defendant did not reply. After a brief hesitation, Quinones stated that he had purchased the tickets for himself and his wife, and that she had planned to come to Chicago with him. He said that when she could not accompany him, he gave the ticket to the defendant. Agent Fulkerson asked them why they had come to Chicago. Quinones responded that he had come to talk with a Chicago lawyer about his pending divorce, and that the defendant had come with him. The tickets and the driver's licenses were then returned to Quinones. Agent Fulkerson asked the defendant about his employment, and the defendant stated that he was unemployed. This questioning lasted four to five minutes.

Agent Fulkerson next asked if they were carrying any drugs, and both the defendant and Quinones said no. Agent Fulkerson

---

1. Upon close inspection of the tickets at the hearing, it was discovered from the reservation record with the tickets that the tickets had been requested in the names of Mr. J. Quinones and *Ms.* C. Quinones. The second ticket was apparently issued to Ms. C. Quinones and later altered with a pen. The alteration was not apparent, however, except upon very close examination. Agent Fulkerson therefore could not have been expected to have discovered the alteration when viewing the tickets at the airport, and it was not pointed out to him by either Quinones or the defendant at the time of the encounter.

asked them if they would consent to a search of their luggage and their person. He told them that the search was voluntary and they could decline if they so chose. Quinones replied in the affirmative, although Agent Fulkerson did not recall his exact words. The defendant said, "Okay. Go ahead." Agent Fulkerson then squatted down and searched the three pieces of luggage, which were on the floor at the feet of the defendant and Quinones. No narcotics were found in the luggage.

While still squatting at the luggage, Agent Fulkerson turned to the defendant and asked him if he was carrying any drugs on his person. The defendant responded, "no," and raised both of his arms parallel to the floor. The defendant had not been asked to raise his arms. From the same squatting position, Agent Fulkerson began searching the defendant, starting with his boots.[2] He felt a lump and asked the defendant what it was. The defendant did not respond, and Agent Fulkerson saw that he was visibly trembling. Agent Fulkerson lifted the pant leg covering the boot, reached inside, and pulled out a clear plastic bag containing a white powder substance he believed to be cocaine, which was later identified as cocaine. Agent Fulkerson then patted the other boot and removed another bag from it in the same manner. The defendant was placed under arrest and immediately informed of his constitutional rights.

Although the defendant and his two associates testified to a different version of the facts, the court found the testimony of Agent Fulkerson and the corroborating testimony of Detectives Wiley and Stout to be highly credible, while it found the testimony of the defendant and his two associates

was not credible on the crucial points where their testimony differed. The defendant, Quinones and Bogdamovic all essentially testified that Agent Fulkerson did not ask their consent to search their persons, that he told Schumacker to put his hands up and that he patted the defendant down starting at the top of his body. The court did not find this testimony credible. The court instead found credible the testimony of Agent Fulkerson, particularly in light of the corroborating testimony of Detectives Wiley and Stout. Both Detectives Stout and Wiley, neither of whom are associated in any way with the DEA, corroborated that Agent Fulkerson asked permission to search the subjects' luggage and their persons. Detective Wiley further corroborated that Agent Fulkerson also told them they did not have to consent to the search. The court therefore finds that the defendant was asked if he would consent to a search of his luggage and his person, that he was told he did not have to consent to the search, and that he agreed to allow Agent Fulkerson to search his luggage and his person.[3]

Finally, the court finds that the entire interview and search episode lasted approximately ten minutes. Agent Fulkerson spoke in a low, conversational tone throughout. No weapons or handcuffs were displayed by the officers at any time.[4]

## FOURTH AMENDMENT ANALYSIS

Not all police-citizen encounters involve seizures invoking the protections of the Fourth Amendment. The Supreme Court has recognized that many encounters between law officers and citizens are purely voluntary in nature, and do not rise to the level of a seizure within the meaning of the

---

2. Agent Fulkerson testified that, based on his prior experience and the numerous arrests he has made at O'Hare Airport, drug couriers commonly carry drugs in their boots.

3. The court also finds that the testimony of the defendant and his associates was not credible in other respects. In particular, the court rejects the testimony of the defendant, Quinones and Bogdamovic that Agent Fulkerson touched Quinones' back when he showed them his badge,

that Agent Fulkerson told them he had a tip that cocaine was coming in from Miami, that one of the officers placed his hand on Bogdamovic and told him not to go anywhere, that all questions were addressed only to Quinones after the tickets were examined, and that Quinones asked to go to the bathroom but was refused permission.

4. Any other finding deemed to be a finding of fact is included as a true finding of fact herein.

Fourth Amendment. *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

As the Supreme Court has recently observed:

[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.

*Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983).

Voluntary police questioning of citizens has been identified as an essential tool in the effective enforcement of criminal laws. *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877; *United States v. $73,277 United States Currency,* 710 F.2d 283, 288–89 (7th Cir.1983). Courts have taken note of the compelling national interest in dealing with the serious problems of illegal drug use, and have recognized the need for voluntary police-citizen encounters, particularly in major metropolitan airports, in order that law enforcement officials can enforce laws aimed at curbing illegal drug use. *Id.*

■ To determine whether the Fourth Amendment has been violated in an encounter between a citizen and law enforcement officials, the court must first decide whether there in fact has been a seizure of the citizen to invoke the Fourth Amendment. The Seventh Circuit Court of Appeals has adopted a "reasonable person" test for determining whether a seizure has occurred. *United States v. Black,* 675 F.2d 129, 133 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983); *United States v. Moya,* 704 F.2d 337, 341 (7th Cir.1983). Under this test, a person has been seized within the purview of the Fourth Amendment if, in view of all the circumstances surrounding the incident, a reasonable person would believe he was not free to leave. *United States v. Mendenhall,* 466 U.S. at 554, 100 S.Ct. at 1877; *United States v. $73,277*

*United States Currency,* 710 F.2d 283 (7th Cir.1983). This determination depends heavily on the circumstances of each case. The court must consider a variety of factors in three major areas: (1) the conduct of the police; (2) the person of the individual citizen; and (3) the physical surroundings of the encounter. *Moya,* 704 F.2d at 340–41; *Black,* 675 F.2d at 134–35.

■ In examining the conduct of the police officer, the court should determine whether the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen such that he is not free to walk away. *Id.* Factors to be considered are whether the officer used physical force, whether the officer is casually dressed or in uniform, whether weapons were displayed, whether the officers approached the individual or whether the individual was summoned to the officers, whether the voices of the officers were raised above a conversational level, whether any threats were made to the citizen, whether driver's licenses, tickets or other forms of identification were kept by the officers, and whether the officers physically blocked the citizen from moving freely away from them. *Id; Florida v. Royer; Mendenhall.*

■ In considering the person of the individual citizen, the court must determine whether the defendant was so naive or vulnerable to coercion that special protection from police contacts is required by the Fourth Amendment. *Id.* Factors to weigh include the person's intelligence, education, articulateness, and ability to understand the English language. *Id.*

■ Finally, the court must take account of the physical surroundings of the encounter. Among the factors to be considered are whether the citizen is isolated from other people, whether the encounter occurred in a well-lit area, a spacious area, an area open to public traffic, an area in which other members of the public are present and may pass through freely, and whether the citizen is requested to accompany the officers to a private room or area. *Id.*

The court must bear in mind all these factors plus the factual circumstances peculiar to each case to determine whether a seizure within the meaning of the Fourth Amendment has occurred.

## CONCLUSIONS OF LAW

■ After careful consideration of all the circumstances in this case, the court concludes that the encounter between Agent Fulkerson, the Indiana detectives, the defendant and his associates was a voluntary police-citizen encounter and not a seizure within the meaning of the Fourth Amendment.

First, with regard to the conduct of the law enforcement officers, the court concludes that Agent Fulkerson and the Indiana detectives did not, by means of physical force or show of authority, restrain the liberty of the defendant or his associates such that they were not free to walk away. The officers did not use any physical force, and no weapons or handcuffs were displayed. The officers were dressed casually, not in uniform. Agent Fulkerson, the only officer who spoke to the young men, spoke in an even, low-key conversational tone of voice. None of the officers threatened the young men in any way. The tickets and driver's licenses of the defendant and Quinones were returned within minutes.

In addition, the physical layout of the encounter was such that the defendant and his associates could have moved freely away from the officers. Although they had stopped to open their bags near some telephones attached to a wall, the young men were not actually up against the wall themselves but were standing a few feet away from it. Since there were three officers and three subjects of the investigation, one officer was quite naturally positioned approximately across from each of the young men. However, they were not surrounded or blocked by the officers. The young men were free to move to either side of them, as the defendant himself admitted, or between the officers. Agent Fulkerson had informed the young men upon approaching them that they did not have to speak with the officers, and nothing in the conduct of the officers would indicate to a reasonable person he was not in fact free to leave if he chose to.

The court further concludes that the personal characteristics of defendant and his associates were such that they would not find the encounter unduly coercive. All three were in their early twenties. The defendant had a high school education, and Quinones had attended college for several years. All three were intelligent, articulate, and had an obvious command of the English language. The defendant had traveled by plane and been in commercial airports on previous occasions. Physically, the defendant and Bogdamovic were taller than all three officers. Therefore, they were not so naive or vulnerable to coercion that they required special protection from police contacts.

Finally, the court has taken into account the physical surroundings of the encounter. The defendant and his associates had stopped in a well-lit, spacious, public concourse connecting two main airport concourses. Many people could be seen walking down each of the main concourses, and people walked freely through the concourse in which the young men were located while they were being interviewed. The entire encounter took place at that one location. The defendant was never taken to an isolated area or private room until after he was arrested. Thus, the physical surroundings of the encounter would not lead a reasonable person to believe that he was not free to leave.

Taking into account all of these circumstances, the court concludes that a reasonable person would have felt he was free to walk away from the officers. Therefore, no seizure of the defendant within the meaning of the Fourth amendment occurred.

■ The court further concludes that the defendant voluntarily consented to the search of his luggage and his person. He consented to the search of his person both

by verbally consenting when Agent Fulkerson asked if he would consent to a search of his luggage and his person, and by raising his arms indicating his submission to a body search when Agent Fulkerson asked him if he had any drugs on his person. The defendant was informed that he did not have to consent to the searches, and there is no indication from the circumstances of the encounter that the consent was not voluntarily given.

The court therefore concludes that the officers did not violate the Fourth Amendment because the encounter was a voluntary police-citizen contact that was not a seizure with the purview of the Fourth Amendment, and because the defendant voluntarily consented to the search of his luggage and his person.

Accordingly, defendant's motion to suppress is denied.