UNITED STATES of America

v.

**Samuel GALINDO–HERNANDEZ and Jesus Salas–Carvajal, Defendants.**

**No. 87–CR–164.**

United States District Court, E.D. New York.

Dec. 1, 1987.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Brooklyn, N.Y., Cheryl Pollak, Asst. U.S. Atty., of counsel, for U.S.

Howard Brownstein, Brownstein, Booth, Barry & Diaz, Union City, N.J., for defendant Samuel Galindo–Hernandez.

Rene A. Sotorrio, Coral Gables, Fla., for defendant Jesus Salas–Carvajal.

## MEMORANDUM–DECISION AND ORDER.

BARTELS, District Judge.

In this case two codefendants, Jesus Salas–Carvajal ("Salas") and Samuel Galindo–Hernandez ("Galindo") move to suppress all statements made by them (both pre and post-arrest), as well as physical evidence discovered in the luggage that they were carrying when arrested. Each defendant is charged with conspiracy to distribute and possession of cocaine in excess of 5 kilograms, in violation of Sections 846 and 841(a)(1) of Title 21 of the United States Code.

*Facts*

The facts of this case are that on March 9, 1987, at approximately 11:20 p.m., Salas and Galindo arrived at LaGuardia Airport aboard Eastern Airlines Flight No. 892, which originated in Miami, Florida. As they left the plane separately, the defendants' Hispanic appearance, "very" nervous

manner, and ill fitting, expensive attire [1] drew the attention of Special Agents McLeod and Curtin of the United States Immigration and Naturalization Service ("INS") [2].

After leaving the plane, each defendant was observed walking, alone, through the airline terminal and towards the taxi stand. Neither retrieved any luggage because they had none. Salas, who was carrying a handbag, an attache case, and a paper bag arrived near a railing at the taxi stand line first, "looked around," and allowed several persons to pass him until he was joined by Galindo who, also carrying a handbag, "looked around" as well. Both of the handbags carried by defendants were fitted with combination locks.

At that point the agents believed that Salas and Galindo might be in the United States illegally, and approached the defendants from two sides, asking them in English which flight they had been on. Significantly, the agents were then physically separated from defendants by the railing, and their ability to walk away was unimpeded. That is, the defendants' path was not blocked. After the defendants indicated that they spoke no English the agents, who both speak Spanish, identified themselves as Immigration Agents in Spanish. Agent McLeod then asked Salas if he would speak to them, and Salas responded affirmatively. This question, though directed at Salas, was also heard by Galindo.

Both individuals were next questioned about their country of origin which, it was learned, was Colombia. Upon being asked for immigration papers, Galindo stated that he had none, although he produced an Eastern Airlines Flight Coupon in the name of S. Pachon, while identifying himself to

the agents as Galindo. This defendant was then asked for further identification, to which he responded in the negative. In answer to a question regarding his presence in the United States, Galindo admitted that he had entered this country illegally in February, 1987. Many of the agent's questions had to be repeated several times. After denying that the handbag was his, Galindo was arrested by the agents for violating the immigration law under authority conferred to them by Section 1357(a)(2) [3] of Title 8 of the United States Code.

Salas, in response to the agent's request for identification, produced a Colombian passport which, upon careful examination, indicated that he had overstayed his visa. The passport was in the name of "Jesus Elias Salas–Carvajal" but his airline ticket was made out to "Moreno, A." When asked if he was carrying any additional identification in the handbag Salas twice denied ownership of it, and began "shaking and sweating profusely." Salas then stated that the locked handbag was given to him by a man in Miami. Unable to establish the legality of his presence in the United States, Salas was also arrested under § 1357 for violating the immigration laws.

After their administrative arrests both defendants were transported to the INS Domestic Task Force Office at JFK International Airport for processing, where each was advised of his rights in Spanish and asked if he would consent to a search of the handbags. With respect to Salas, a Spanish advice of rights form (I–124) was first read to him, and then by him. After indicating that he understood those rights, Salas executed the form. A Spanish consent to search form was also read to and

---

**1.** With respect to defendants' "nervousness", Agent McLeod testified that Salas walked stiffly, rigidly, and quickly while constantly looking over his shoulder as if he were fearful of apprehension. Similarly, Galindo looked away from Agent Curtin in a "pronounced" manner, and then walked away rapidly and rigidly, looking back over his shoulder and in the agent's direction. In terms of attire, the testimony was that Salas' clothes were "ill fitting," while Galindo's appeared "brand new" but arguably inappropriate for warm weather.

**2.** Agent Curtin has been a member of the INS border patrol for 7 years and an INS Agent for 3 years, during which time he has been involved in several thousand arrests of illegal aliens. Agent McLeod, an INS agent for 6½ years, has made between 5,000 and 8,000 such arrests.

**3.** This section empowers INS agents to arrest any alien in the United States upon probable cause to believe that said alien has violated the immigration laws and "is likely to escape before a warrant can be obtained for his arrest...." *Id.*

by Salas, who understood and executed it. Galindo underwent a procedure identical to the aforementioned one, except that Galindo did not himself read the consent to search form.

Up to this time neither defendant had requested an attorney or otherwise indicated a desire to remain silent. Instead, when the agents requested that Galindo open "his" handbag, Galindo denied ownership of it a second time. The handbag was then opened, and found to contain 1.1 kilograms of cocaine.

Galindo subsequently explained that the bag was given to him in Miami by a man named Francisco Mejia for delivery to a location in Queens. He added that in return for this delivery, Mejia bought him a new suit of clothes and paid Galindo $1,000.

Salas, just prior to the opening of "his" bag, denied ownership of it for a third time and stated that he did not know the lock's combination. The bag was then forced open by the agents, revealing 5.5 kilograms of cocaine, a colostomy bag, and numerous papers in the name of "Jesus Salas." In so doing, the agents also noted that the handbag Salas carried bore the initials "JES".

Salas and Galindo were subsequently placed under arrest a second time for narcotics violations, whereupon Salas requested an attorney and all questioning ceased.

### Discussion

Given the facts of this case, it is clear that the admissibility of the defendants' statements, made at various times prior to and after their arrest, bears directly upon the admissibility of the contents of the handbags. Consequently, we must first determine whether those statements were legally obtained. This initial determination involves an analysis of three discrete, but closely related events: the initial contact between the defendants and INS agents; followed by their arrest; which led to a period of post-arrest detention.

### I. The Admissibility of Defendants' Statements

#### The Initial Contact

During the preceding decade three distinct levels of police/citizen contact have emerged from a series of Supreme Court decisions. *See INS v. Delgado*, 466 U.S. 210, 216–17, 104 S.Ct. 1758, 1762–63, 80 L.Ed.2d 247 (1984); *Florida v. Royer*, 460 U.S. 491, 497–98, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983); *U.S. v. Mendenhall*, 446 U.S. 544, 553–55, 100 S.Ct. 1870, 1876–78, 64 L.Ed.2d 497 (1980); *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968). *U.S. v. $73,277, United States Currency*, 710 F.2d 283, 288 (7th Cir.1983) (wherein the court noted that 6 of the present Supreme Court Justices have adopted the "reasonable man" test regarding whether a seizure has occurred). The first two contact levels, arrests and brief investigatory stops, both involve restraints imposed upon a person's liberty, and therefore implicate the Fourth Amendment's prohibition against unreasonable seizures.

However, in the third level, where personal intercourse between policemen and citizens is voluntary, then no "restraint" upon liberty, and therefore no seizure, has occurred. *Royer, supra; Terry, supra; U.S. v. Smith*, 649 F.2d 305 (5th Cir.1981) cert. den. 460 U.S. 1068, 103 S.Ct. 1521, 75 L.Ed.2d 945 (1983). That is, "a person has been 'seized' ... only if ... [under] the circumstances ... a reasonable person would have believed that he was not free to leave." *U.S. v. Ceballos*, 812 F.2d 42 (2d Cir.1987) *citing U.S. v. Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877 (plurality opinion of Stewart, J.). Accordingly, voluntary encounters between the police and the populace simply do not implicate the Fourth Amendment. *Royer, supra; Terry, supra; Ceballos, supra. See also U.S. v. Sugrim*, 732 F.2d 25 (2d Cir.1984); *U.S. v. Baptist*, 556 F.Supp. 284 (S.D.N.Y.1982). The government argues that, until defendants were arrested for violating the immigration laws, the police/citizen encounter here was voluntary, and therefore no seizure occurred.

■ When determining whether an encounter was voluntary the Court must, under the totality of the circumstances, determine the degree of coercion extant in a

particular case. *Ceballos, supra; U.S. v. Berry,* 670 F.2d 583, 597 (5th Cir.1982). If coercion is present, then the Court will find that a reasonable person would have believed that his freedom had been limited, and the defendant was therefore seized. *U.S. v. Puglisi,* 723 F.2d 779 (11th Cir. 1984); *Berry,* 670 F.2d at 597.

The factors relevant to a voluntariness determination in this context may be broken down into three general groups: (1) the conduct of the police; (2) the characteristics of the person being questioned; and (3) the physical surroundings of the encounter. *See Mendenhall,* supra; *U.S. v. Ilazi,* 730 F.2d 1120 (8th Cir.1984); *U.S. v. Black,* 675 F.2d 129, 134–35 (7th Cir.1982) cert. den. 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983); *U.S. v. Schumacker,* 577 F.Supp. 590, 595 (D.C.Ill.1983).

■ With respect to police conduct, it is clear that simply asking questions of individuals willing to listen to them permits no inference of coercion. *Royer,* 460 U.S. at 497–98, 103 S.Ct. at 1324. So too, the mere fact that an officer identifies himself as a police officer cannot convert an otherwise voluntary encounter into a seizure. *Id.* On the other hand, blocking an individual's path or otherwise physically impeding his progress is a "consideration of great and probably decisive significance," because this action implicitly restrains liberty. *Berry,* 670 F.2d at 597; *U.S. v. Puglisi,* 723 F.2d 779 (11th Cir.1984); *U.S. v. Bowles,* 625 F.2d 526 (5th Cir.1980).

■ Other "police conduct" factors warranting various degrees of consideration include the use of physical force, weapons, or raised voices, and whether the officer was casually dressed or in uniform. *Sugrim,* 732 F.2d at 28; *U.S. v. Manchester,* 711 F.2d 458, 460 (1st Cir.1983); *Benitez–Mendez v. I.N.S.,* 760 F.2d 907 (9th Cir. 1983); *U.S. v. Waksal,* 709 F.2d 653 (11th Cir.1983); *U.S. v. Patino,* 649 F.2d 724, 727 (9th Cir.1981); *Gomez v. Turner,* 672 F.2d 134, 144 (D.C.Cir.1982); *U.S. v. Schumacker,* 577 F.Supp. 590, 595 (N.D.Ill.1983).

Where, as here, the agents seek a person's consent to be questioned *before* further investigation, then the request for permission gives rise to an inference of voluntariness from the encounter's outset which is not easily dissipated. *See, e.g., Royer,* 460 U.S. at 493–94, 103 S.Ct. at 1321–22; *U.S. v. Palen,* 793 F.2d 853 (7th Cir.1986); *U.S. v. Borys,* 766 F.2d 304 (7th Cir.1985) cert. den. 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed. 2d 893 (1986); *U.S. v. Manchester,* 711 F.2d at 460 (1st Cir.1983); *U.S. v. Wylie,* 569 F.2d 62, 66 (D.C.Cir.1977) cert. den. 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978).

■ In this case the defendants' individual characteristics are not applicable to the seizure inquiry.[4]

As for the third group of factors, physical surroundings, various courts have identified the time of the encounter and whether it occurred in a well lit, spacious area open to the public or in an isolated area (suggesting "quasi-imprisonment") as germane to a seizure determination. *See Royer,* 460 U.S. at 508, 103 S.Ct. at 1329 (Powell, J., concurring); *Gomez,* 672 F.2d at 144; *Schumacker,* 577 F.Supp. at 595.

Before applying this plethora of factors to the case at bar, we note that, to date, the Supreme Court has provided little practical guidance in the seizure area. Specifically, there has been no single case in which 5 Justices have united on the seizure issue. Instead, in *U.S. v. Mendenhall,* Justice Stewart, joined by Justice Rehnquist, wrote that where a defendant was approached by agents who identified themselves and, without seeking her consent to be questioned, requested that she produce her identification and ticket, no seizure had occurred while the three concurring Justices in that case explicitly did not reach the seizure issue. 446 U.S. at 560 n. 1, 100 S.Ct. at 1880 n. 1. Later, in *Florida v. Royer,* 4 Justices agreed that the following events did not constitute a seizure: a defendant was approached by agents who identified

---

**4.** This conclusion follows because the agents questioned both defendants in Spanish, their native tongue, and no evidence was adduced with respect to defendants' respective educations or familiarity with federal law enforcement procedures.

themselves and then, in contrast to *Mendenhall*, sought the defendant's consent to be questioned prior to asking for and examining his driver's license and airline ticket. 460 U.S. 497–98, 103 S.Ct. at 1324.

In this case, the following factors are implicated: (1) the agents, who were not in uniform, identified themselves as INS personnel upon approaching the defendants; (2) who, after being asked "whether" they would speak to the agents, responded affirmatively; and were then (3) questioned with regards to their immigration status in a public area. At no time prior to their administrative arrest did defendants indicate that they wished to depart, or attempt to do so, and neither was physically prevented by the agents from such action. In addition, the agents' inquiries were conducted calmly, without raised voices. It is therefore apparent that the voluntary police/citizen encounter that occurred here did not implicate the Fourth Amendment. *See U.S. v. Lehmann*, 798 F.2d 692 (4th Cir.1986); *U.S. v. Pavelski*, 789 F.2d 485 (7th Cir.1986) cert. den. —— U.S. ——, 107 S.Ct. 322, 93 L.Ed.2d 295; *U.S. v. Espinosa–Guerra*, 805 F.2d 1502 (11th Cir.1986); *U.S. v. Collis*, 766 F.2d 219 (6th Cir.1985) cert. den. 474 U.S. 851, 106 S.Ct. 150, 88 L.Ed.2d 124; *U.S. v. Palen*, 793 F.2d 853 (7th Cir.1986); *Manchester, supra; U.S. v. Smith*, 649 F.2d 305 (5th Cir.1981) cert. den. 460 U.S. 1068, 103 S.Ct. 1521, 75 L.Ed. 2d 945 (1983) (all holding that no seizure occurred where agents approach defendant, identify themselves, ask defendant if he would answer some questions, and question him with respect to his identity and destination). *See also U.S. v. Alvarez–Sanchez*, 774 F.2d 1036, 1039 (11th Cir. 1985) (wherein court implicitly held that agents' failure to first ask defendant's permission before questioning him did not transform an otherwise voluntary encounter into a seizure).

### Validity of the "Seizure"

Even assuming, *arguendo*, that the airport encounter was a seizure, the Court would nevertheless find it valid. In this context defendants make two contentions: that the pre-arrest restraint on their liberty was the functional equivalent of an arrest unsupported by probable cause and, alternatively, that the quantum of objective facts necessary to justify a *Terry* stop was lacking here.

The defendants' "functional arrest" argument is clearly misplaced, and need not detain us. *See, e.g., U.S. v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Kolender v. Lawson*, 461 U.S. 352, 364–65, 103 S.Ct. 1855, 1862, 75 L.Ed.2d 903 (1983); *U.S. v. Brignoni–Ponce*, 422 U.S. 873, 880–882, 95 S.Ct. 2574, 2579–81, 45 L.Ed.2d 607 (1975). Instead, the inquiry is whether, under *Terry v. Ohio, supra,* considering the brief stop which occurred, the agents' possessed specific and articulable facts sufficient to give rise to a reasonable suspicion that Salas and Galindo were in the country illegally prior to their "seizure." *See U.S. v. Forero–Rincon*, 626 F.2d 218, 221–22 (2d Cir.1980); *U.S. v. Magda*, 547 F.2d 756 (2d Cir.1976) cert. den. 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977). Those articulable facts were: (i) the defendants' arrival in New York from a flight originating in Miami, which the agents knew to be a departure point for many illegal aliens; (ii) their Hispanic appearance; (iii) their "nervous mannerisms"; (iv) their lack of luggage; (v) one defendant's expensive but ill fitting attire; and (vi) the attempt by both defendants to create the appearance of traveling alone, while actually traveling together.

In *U.S. v. Hernandez–Rojas*, 470 F.Supp. 1212 (E.D.N.Y.1979) aff'd w/o opinion, 615 F.2d 1351 (2d Cir.1979), the court found the agents' suspicion concerning a defendant's illegal status was reasonable on facts strikingly similar, but less compelling, than those in the case at bar. *See also U.S. v. Alvarado–Bermudez*, 499 F.Supp. 1070 (E.D.N.Y.1980). So too, we find that the aforementioned facts provided the agents with sufficient reasonable suspicion to validate the minimally intrusive seizure that occurred here. Accordingly, the defendants' pre-arrest statements, particularly with respect to their handbags and immi-

gration status, are admissible in evidence.[5]

### The Administrative Arrests

■■■ To be sure an arrest, to be constitutional, must be supported by probable cause. In this case it is clear that once Galindo admitted he had entered the United States illegally, there was probable cause to effect his arrest. Similarly, Salas' expired visa, coupled with his inability to produce any documentation in refutation thereof, provided sufficient grounds for his arrest. *See Ojeda–Vinales v. Immigration and Naturalization Service,* 523 F.2d 286, 288 (2d Cir.1975).

Nevertheless, as a matter of statute warrantless arrests for violations of the immigration laws must also be based upon a reasonable belief that the arrestee "is likely to escape before a warrant can be obtained for his arrest...." 8 U.S.C. § 1357. The circumstances of these arrests ·also satisfy this statutory requirement. As the Court of Appeals noted in *Contreras v. U.S.,* 672 F.2d 307, 309 (2d Cir.1982), the clear and undisputed deportability of an alien "may alone provide a sufficient basis for an INS officer to believe that escape is likely before a warrant can be obtained." *See also Ojeda–Vinales,* 523 F.2d at 288 (where a "clear-cut" violation of the immigration laws had occurred it was obvious that the arresting officer's belief that the arrestee was likely to escape before a warrant could be obtained was reasonable). The defendants' challenge to their administrative arrests must fail.

### Post–Arrest Statements

■■ As noted previously, defendants made several statements subsequent to their arrest, the most important having to do with the handbags allegedly belonging to one Francisco Mejia. The admissibility of these statements is now challenged on two bases: that the defendants were not informed of their rights, as required by the *Miranda* decision and, in the alternative, that any statements made resulted from the coercive conditions surrounding their interrogation, in violation of Due Process. Of course, if either of these events had transpired the defendants' post-arrest statements would have to be excluded. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The difficulty with defendants' arguments is that, at the hearing, no evidence was adduced in support of their factual contentions. To the contrary, it is clear that defendants understood their *"Miranda* rights" and voluntarily waived them. Accordingly, their post-arrest statements will not be suppressed.

### II. The Admissibility of the Contents of the Handbags

■■ Having determined that these defendants, who were legally stopped and arrested, also made various admissible pre- and post-arrest statements, we now turn to the crux of this suppression motion—the admissibility of drugs and other items discovered in the handbags. With respect to these bags the government argues that defendants, having denied ownership in them, now lack "standing" to challenge their search.

Here, Galindo twice denied ownership of the handbag that he carried. It is not necessary for us to find an abandonment here, however, because, as noted previously, subsequent to his arrest Galindo signed a consent to search form, in Spanish, after first being read his rights in Spanish. This waiver, which we find to be knowing and voluntary, explicitly permitted the agents to search the handbag. Galindo cannot now object to the government's use of the fruits of that search, and his motion to suppress the items obtained thereby is accordingly denied.

Similarly, defendant Salas, subsequent to his arrest, signed a consent to search form in Spanish after first being read his rights

---

**5.** Though neither party has raised the issue, it is clear that *Miranda* warnings are not required during a *Terry* stop. *U.S. v. Foley,* 735 F.2d 45, 47 (2d Cir.1984); *Berry,* 670 F.2d at 604 n. 28; *U.S. v. Penalo,* 516 F.Supp. 1042, 1048 (E.D.N.Y. 1981).

in Spanish. Our prior discussion with respect to Galindo's consent to search applies with equal force here, and Salas' suppression motion is denied on that basis.[6]

SO ORDERED.

---

**6.** In light of the aforementioned decisions, we do not reach the government's contention that the contents of the shoulder bags are admissable under the inventory search exception to the warrant requirement.