The **PEOPLE** of the State of Colorado,
Plaintiff–Appellant,

v.

Ernesto **CARILLO–MONTES**,
Defendant–Appellee.

No. 90SA31.

Supreme Court of Colorado,
En Banc.

Sept. 10, 1990.

Stephen K. ErkenBrack, Dist. Atty., Twenty–First Judicial District, Martha L. Kent, Deputy Dist. Atty., Grand Junction, for plaintiff-appellant.

Philip Coebergh, Grand Junction, for defendant-appellee.

Justice LOHR delivered the Opinion of the Court.

The prosecution has filed this interlocutory appeal pursuant to C.A.R. 4.1 challenging an order of the Mesa County District Court suppressing statements and physical evidence obtained from the defendant. Police officers elicited the statements and discovered the evidence after an investigatory stop of the defendant. The trial court concluded that the officers lacked reasonable suspicion to justify the stop and suppressed the statements and other evidence as fruit of the invalid stop. We affirm the trial court's order and remand the case for further proceedings.

I.

The Mesa County Narcotics Enforcement Team was investigating Guadalupe Hernandez–Barba for an alleged narcotics violation. At about 3:30 p.m. on August 14, 1989, an undercover informant met with Hernandez–Barba in a park in Grand Junction. Hernandez–Barba showed the informant four ounces of cocaine and said he would sell him one ounce. Hernandez–Barba then went to his residence at 1353 North 21st in Grand Junction, returned within a half-hour and displayed an ounce of cocaine to the informant. Police officers arrested Hernandez–Barba shortly thereafter. The officers then sought a warrant to search Hernandez–Barba's residence. Before the warrant was obtained, Detective Booth and Officer Grimsby went to 1353 North 21st. They saw a man outside the house talking through the screen door to a woman inside, and they saw the woman run into the house away from the door. The police then entered the house to secure the premises. Officer Mendoza of the Grand Junction Police Department arrived soon afterwards to maintain security of the area.

The man at the door was the driver of a Buick parked in front of the house.[1] A woman and a small child were in the front seat. Two men, one of whom was the

---

1. The trial court specifically found that the man was the driver. This finding is supported by inference from the proximity of the Buick to the residence and the evidence that the driver's seat was unoccupied and the other seats were not.

defendant, were in the back seat. Detective Booth approached the vehicle, asked the occupants for identification, and received no response. Officer Mendoza then spoke to the defendant in Spanish and asked him for documentation as to his identity. The defendant produced no documentation. The officers concluded that the defendant did not speak English and radioed the dispatcher with instructions to contact Special Agent Hines of the Immigration and Naturalization Service. Agent Hines arrived approximately fifteen minutes later.

Sometime before Hines reached the scene, the driver of the car was stopped by the officers and identified. The trial court found that "[w]hen INS Agent Hines arrived, the driver was still outside the car, apparently speaking with Booth." Upon arrival, Agent Hines talked with the defendant, who told Hines that he was an illegal alien. The defendant was then arrested, handcuffed and transported to the Mesa County Jail. The defendant sought to suppress evidence obtained from him at the scene in the course of a search incident to the arrest and during a later search at the jail.

The trial court concluded that the police had conducted an investigatory stop of the defendant without having a reasonable suspicion that the defendant had engaged in or was about to engage in criminal conduct. The court, therefore, suppressed the evidence subsequently obtained from the defendant.

## II.

 Initially, we consider whether the defendant was subjected to an investigatory stop implicating the fourth amendment to the United States Constitution and article II, section 7, of the Colorado Constitution.[2] A contact between the police and a citizen constitutes a seizure within the meaning of the fourth amendment when the police restrain the liberty of the citizen by physical force or show of authority. *Immigration and Naturalization Serv. v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968); *People v. Stevens*, 183 Colo. 399, 405, 517 P.2d 1336, 1339 (1973); *Stone v. People*, 174 Colo. 504, 508, 485 P.2d 495, 497 (1971). An arrest may be the clearest example of such a seizure, but seizures involving only a brief detention also implicate the fourth amendment. *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975); *Davis v. Mississippi*, 394 U.S. 721, 726–27, 89 S.Ct. 1394, 1397–98, 22 L.Ed.2d 676 (1969); *People v. La-Grutta*, 775 P.2d 576, 579 (Colo.1989); *Stone*, 174 Colo. at 508, 485 P.2d at 497. Not all encounters with the police, however, amount to seizures. *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. The United States Supreme Court has stated that a person is seized "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Delgado*, 466 U.S. at 215, 104 S.Ct. at 1762 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Stewart and Rehnquist, JJ.)). Examples of such circumstances include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877.

 The record reflects that Officers Booth, Grimsby and Mendoza "secured" the residence at 1353 North 21st.[3] The

---

**2.** The fourth amendment to the United States Constitution prohibits "unreasonable searches and seizures." Article II, § 7, of the Colorado Constitution also protects people against "unreasonable searches and seizures." The prosecution does not contest that the defendant was subjected to a seizure in the form of an investigatory stop. It appeals the suppression order solely on the ground that the stop was justified by reasonable suspicion. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**3.** As the trial court found, no testimony was presented as to exactly what constituted "securing" the residence. Officer Booth testified that

driver of the vehicle was questioned and detained. Booth approached the vehicle in which the defendant was sitting and questioned the defendant. Because the defendant did not respond to the questioning, Officer Mendoza questioned the defendant in Spanish. By asking for the defendant's "papers or documentation," Mendoza made clear that the police were suspicious of the defendant's residency status. Fifteen minutes later, Special Agent Hines arrived and further questioned the defendant. Mendoza testified that while waiting for Agent Hines, Mendoza "stood by the car, watched the two gentlemen that were seated in the back seat until [Hines] arrived" and that while Hines was talking to them Mendoza "maintained a visual on both of them."

The trial court found:

> [g]iven these circumstances, which include the prompt 'securing' of the residence, the questioning and detention of the driver of the car in which the defendant was a passenger and the presence of at least three law enforcement officers, a reasonable person in the defendant's shoes would have believed he was not free to leave at this point.

The trial court applied the correct legal standard to the historical facts found by the court, which are supported by the evidence. The defendant, therefore, was subjected to a seizure within the meaning of the fourth amendment of the United States Constitution and article II, section 7, of the Colorado Constitution.

### III.

■ Next, we must consider whether the officers' stop of the defendant was supported by reasonable suspicion of criminal activity. Under the United States Constitution[4] and the Colorado Constitution[5] a police officer may stop a person for investigatory purposes under narrowly defined circumstances without having probable cause to arrest. *E.g., Dunaway v. New York,* 442 U.S. 200, 208–10, 99 S.Ct. 2248, 2254–55, 60 L.Ed.2d 824 (1979); *People v. Gar-*

when the woman inside the residence ran away from the screen door into the house "entry was made into the house for the purpose of securing the premises."

*cia,* 789 P.2d 190, 191 (Colo.1990). In order not to run afoul of the constitutional proscriptions of unreasonable seizures, in making such a stop "(1) there must be an articulable and specific basis in fact for suspecting that criminal activity has taken place, is in progress, or is about to occur; (2) the purpose of the intrusion must be reasonable; and (3) the scope and character of the intrusion must be reasonably related to its purpose." *People v. Contreras,* 780 P.2d 552, 555 (Colo.1989); *accord People v. Ratcliff,* 778 P.2d 1371, 1376 (Colo.1989); *see also Brignoni–Ponce,* 422 U.S. at 881, 95 S.Ct. at 2580.

■ The threshold issue in this case is whether the first of those three requirements was met. The question is "whether there were specific and articulable facts known to the officer, which taken together with rational inferences from these facts, created a reasonable suspicion of criminal activity to justify the intrusion into the defendant's personal security." *People v. Thomas,* 660 P.2d 1272, 1274 (Colo.1983); *accord United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981); *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979). The totality of the circumstances must be considered in determining whether the police officer had a reasonable suspicion. *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *Contreras,* 780 P.2d at 555. "The specific facts known to the officer immediately prior to the intrusion, together with rational inferences based upon those facts, are critical." *People v. Bell,* 698 P.2d 269, 272 (Colo.1985); *accord Cortez,* 449 U.S. at 418, 101 S.Ct. at 695. Moreover, the trial court's findings of historical fact are binding upon us if they are supported by competent evidence. *E.g., People v. Trujillo,* 784 P.2d 788, 792 (Colo.1990); *People v. Cleburn,* 782 P.2d 784, 786–87 (Colo.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1959, 109 L.Ed.2d 321 (1990).

4. U.S. Const. amend. IV.

5. Colo. Const. art. II, § 7.

■ The trial court found that the defendant was merely a passenger in the rear seat of a car parked on a public street in front of a house the police had a warrant to search. The driver was at the door of the house, talking with a person who was inside. The trial court concluded that there was no basis for a reasonable suspicion that the driver was engaged in illegal behavior and even less basis for a reasonable suspicion that the defendant was so engaged. We agree.

Although in the present case the police officers had strong reason to believe that Hernandez–Barba kept cocaine in the house, the trial court's findings contain nothing to suggest a connection between drug activity and the driver's presence at the residence. Furthermore, there was nothing at all to suggest that the defendant was privy to the driver's purpose in going to the door of the residence and conversing with an occupant. The fact that a person keeps cocaine at a residence is simply insufficient to raise a reasonable suspicion that everyone who approaches that residence, and all occupants of the cars used by such persons to travel to that residence, are in some way involved in a transaction related to the cocaine. *Cf. Sibron v. New York*, 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968) ("[t]he inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security.").

### IV.

■ Because the officers lacked reasonable suspicion, the investigatory stop was illegal. The subsequent arrest and search incident to the arrest, therefore, were also illegal and evidence obtained as a result of the arrest and search must be suppressed as fruit of the poisonous tree. *See Alderman v. United States*, 394 U.S. 165, 176–77, 89 S.Ct. 961, 968–69, 22 L.Ed.2d 176 (1969); *Wong Sun v. United States*, 371 U.S. 471, 484–86, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963); *Garcia*, 789 P.2d at

193–94; *People v. Briggs*, 709 P.2d 911, 915 (Colo.1985).

Accordingly, we affirm the trial court's suppression order and remand the case for further proceedings consistent with this opinion.

VOLLACK, J., dissents, and ROVIRA, C.J., joins in the dissent.

Justice VOLLACK dissenting:

I respectfully dissent from the majority holding affirming the suppression order of the Mesa County District Court. In my opinion the encounter between the defendant and the law enforcement officers involved in this case did not constitute a seizure implicating the fourth amendment. I would therefore reverse the suppression order of the district court.

Not every encounter between police officers and citizens implicates the fourth amendment. *Immigration and Naturalization Serv. v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984). "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him some questions, by putting questions to him if he is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); *see also People v. Casias*, 193 Colo. 66, 74 n. 9, 563 P.2d 926, 932 n. 9 (1977). The Court noted in *Delgado*, 466 U.S. at 216, 104 S.Ct. at 1762, that "[w]hat is apparent from *Royer* and *Brown* [*v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979),] is that police questioning, by itself, is unlikely to result in a Fourth Amendment violation." "Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Delgado*, 466 U.S. at 215, 104 S.Ct. at 1762; *accord Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968); *People v. Harper*, 726 P.2d 1129, 1131 (Colo.1986). In determining whether police officers have "seized" citizens within the

meaning of the fourth amendment, the Supreme Court has considered whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Delgado*, 466 U.S. at 215, 104 S.Ct. at 1762; *accord United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *Harper*, 726 P.2d at 1131; *People v. Thiret*, 685 P.2d 193, 203 (Colo.1984). The *Delgado* Court stated that "[u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment." *Delgado*, 466 U.S. at 216, 104 S.Ct. at 1763.

> The relevant criteria to be considered in determining whether a person is in custody include, *inter alia*, the time, place, and purpose of the encounter; the words used by the officer; the officer's demeanor; and the person's verbal or nonverbal response to any directions given to him by the officer.

*Harper*, 726 P.2d at 1131; *see also People v. Milhollin*, 751 P.2d 43, 49–50 (Colo.1988). Whether a particular set of facts and circumstances describes a "seizure" within the meaning of the fourth amendment is an objective question of law. *See Milhollin*, 751 P.2d at 50; *People v. Ratcliff*, 778 P.2d 1371, 1376 (Colo.1989).

In *Delgado*, the Court held that Immigration and Naturalization Service agents did not effect a seizure under the fourth amendment when they arrived at a factory unannounced and questioned the factory workers individually about their identification and their immigration status. 466 U.S. at 218, 104 S.Ct. at 1763. In *Delgado* some of the immigration agents positioned themselves near the exits of the factory building. *Id.* The respondents argued that "the manner in which the surveys were conducted and the attendant disruption caused by the surveys created a psychological environment which made [the factory workers] reasonably afraid that they were not free to leave." *Id.* at 220, 104 S.Ct. at 1765. The Court rejected this argument and held that "the encounters [with the INS agents] ... were classic consensual encounters rather than Fourth Amendment seizures." *Id.* at 221, 104 S.Ct. at 1765.

When Detective Booth approached the car in which the defendant was sitting and asked the persons in the back seat for identification, his contact with the occupants of the car did not constitute a "seizure" within the meaning of the fourth amendment. In this case the defendant and the other person questioned were seated in a car on the street. *Cf. Benitez–Mendez v. Immigration and Naturalization Serv.*, 760 F.2d 907, 909 (9th Cir.1983) (no seizure where officers approached petitioner in an open field and asked questions); *United States v. Castellanos*, 731 F.2d 979, 983–84 (D.C.Cir.1984) (no seizure occurred where police officer approached man in parked car and asked for identification); *United States v. Galindo–Hernandez*, 674 F.Supp. 979, 984 (E.D.N.Y.1987). Detective Booth testified that at the time he approached the car his main concern was the Hernandez–Barba residence. In response to the district attorney's question, "What would you have done at the time you first came to the scene if Ernesto Carillo and the other people in this vehicle had driven away?" Detective Booth stated: "I don't know what I would have done. My—our intentions were to secure that residence." Detective Booth asked the defendant for identification but the defendant did not respond, leading Detective Booth to conclude that the defendant did not speak English. There is no indication in the record that Detective Booth indicated to the defendant that he was not free to leave, or prevented the defendant or any other occupant of the car from leaving. *Cf. Delgado*, 466 U.S. at 212, 104 S.Ct. at 1760; *Benitez–Mendez*, 760 F.2d at 909; *but cf. Royer*, 460 U.S. at 501, 103 S.Ct. at 1326.

Detective Booth then asked the police dispatcher to contact Special Agent Hines of the Immigration and Naturalization Service. Detective Booth felt that Agent Hines, who speaks Spanish fluently, could communicate with the persons in the back seat of the car. Before Agent Hines ar-

rived, Officer Mendoza of the Grand Junction Police Department asked the defendant in Spanish "if he had the English equivalent of papers or documentation." The defendant did not produce any documents. Officer Mendoza testified that his initial contact with the defendant was "[v]ery brief, just during the course of the questioning about his documents. No more than that. It was very brief."

Agent Hines testified that when he arrived, which was approximately fifteen minutes after Detective Booth's initial encounter with the defendant, there were no law enforcement personnel in the immediate vicinity of the car. Agent Hines asked the defendant to state his citizenship, and asked the defendant if he had any documents that would show that he was legally in the United States.[1] The defendant did not produce any documents, and told Agent Hines that he was an illegal alien. Agent Hines and Officer Mendoza then arrested the defendant. Agent Hines later discovered that the defendant had in fact been admitted into the United States as a permanent resident.

The district court concluded that a detention had taken place when Booth asked the defendant for identification because the Hernandez–Barba residence had been "secured," the driver of the car had been detained for questioning, and at least three law enforcement officers were present.[2] The district court found, however, that there was no testimony at the hearing about exactly what was involved in the "securing" of the residence. The car in which the defendant sat was parked on the street in front of the residence. There is no support in the record for the district court's conclusion that the driver of the car had been *detained* for questioning. Finally, the mere presence of police officers does not transform encounters between law enforcement officers and citizens into fourth amendment seizures. *Delgado*, 466 U.S. at 218, 104 S.Ct. at 1763; *Castellanos*,

731 F.2d at 983; *Galindo–Hernandez*, 674 F.Supp. at 984. Under the circumstances of this case, the encounter between the defendant and Detective Booth was a consensual encounter which did not implicate the fourth amendment. *Delgado*, 466 U.S. at 221, 104 S.Ct. at 1765; *Castellanos*, 731 F.2d at 983; *Galindo–Hernandez*, 674 F.Supp. at 984.

The district court held that if the initial questioning of the defendant was legal, then everything the officers did subsequent to questioning the defendant was legal, including arresting and searching the defendant. I would hold that the initial encounters between the defendant and Detective Booth, Officer Mendoza, and Agent Hines did not constitute a fourth amendment seizure. Therefore, I would not address whether any of the officers possessed a reasonable suspicion which would have justified an investigatory detention of the defendant, and I would reverse the suppression order of the district court.

I am authorized to say that Chief Justice ROVIRA joins in this dissent.

---

1. Agent Hines spoke to the defendant in Spanish but later discovered that the defendant "speaks English pretty well."

2. The record suggests that Officer Mendoza was in uniform, but does not indicate how Detective Booth, Officer Grimsby, or Agent Hines were dressed.