The PEOPLE of the State of Colorado, Plaintiff–Appellant,

v.

Frank COCA, Defendant–Appellee.

No. 91SA396.

Supreme Court of Colorado,
En Banc.

May 11, 1992.

Jon Neil Barclay, Dist. Atty., Third Judicial Dist., Trinidad, for plaintiff-appellant.

David F. Vela, Colorado State Public Defender, Denver, Cynthia Mares, Deputy State Public Defender, La Junta, for defendant-appellee.

Justice ERICKSON delivered the Opinion of the Court.

This is an interlocutory appeal from an order suppressing evidence seized in an investigatory stop. The defendant, Frank Coca, filed a motion to suppress the evidence seized as a result of the investigatory stop and the trial court granted the motion. We affirm the trial court.

After dark, at approximately 6:00 p.m., on November 10, 1990, the defendant was driving a Toyota pickup truck in a remote area near the intersection of Mavaricio Canyon Road and Apishpapa Canyon Road. As he approached the intersection, Officer Crosby of the Colorado Division of Wildlife stopped the truck pursuant to the instructions of Bob Holder, a fellow wildlife officer. Officer Crosby searched the Coca truck and found a wild turkey, which had been recently shot, under a tarpaulin in the back of the truck.

The issue on appeal is whether there was a reasonable and articulable suspicion to support the investigatory stop and search of the vehicle. The stop occurred during the hunting season for small game and water fowl, and the last weekend of a combined deer and elk season. Not long before the stop, a landowner in the Mavaricio Canyon area told Officer Holder that she had heard a shot outside of her house. Officer Holder then contacted a group of hunters to determine whether they had shot any animals in the area. They reported that they could not hunt because it was nightfall and were checking the area out for a hunt the next day. They told the officer they had seen a Chevrolet truck driving slowly in the area. Based on that report, Officer Holder advised Officer Crosby to cover the road so he could investigate the situation. He did not give Officer Crosby a description of the truck to be stopped.

While investigating, Officer Holder saw a truck going down the Mavaricio Canyon Road at a slow rate of speed with its lights on and thought it might be involved in a possible hunting violation. He advised Officer Crosby by radio to stop the truck. The speed limit on Mavaricio Canyon Road was thirty miles per hour. In Officer Crosby's opinion, Coca's truck was traveling at a speed of five to ten miles per hour. When Officer Crosby stopped the truck, Coca was driving and his son, Nathan, was in the passenger seat with a .22 rifle between his legs with the muzzle pointed up. Officer Crosby checked the firearm to make sure it was unloaded[1] and then examined another firearm in the truck and found that it was unloaded. He asked Coca and his son if he could take a look in the back of the truck. In his search he found a wild turkey under a tarpaulin. After being questioned by the officer, Nathan admitted that he had shot the turkey.

A number of charges, including both felonies and misdemeanors, were filed as a result of the stop and the events occurring immediately after the stop. The trial court found that there was no reasonable and articulable suspicion to support the stop and suppressed the wild turkey seized from

---

1. Officer Crosby testified that he thought he saw Nathan remove the clip from the rifle, but that he checked the rifle and found that there was no shelling in the chamber of the rifle and no violation of the statute.

the back of the Coca truck as evidence to prove the wildlife offenses charged.

A law enforcement officer, acting on less than probable cause, can detain and, to a limited extent, interrogate a person or persons detained as part of an investigative stop. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Stone v. People*, 174 Colo. 504, 485 P.2d 495 (1971); § 16–3–103, 8B C.R.S. (1986).

█ To determine whether an investigative stop was based upon a reasonable and articulable suspicion and was constitutionally permissible, a trial court must consider "the facts and circumstances known to the officer at the time of the encounter." *People v. Savage*, 698 P.2d 1330, 1335 (Colo. 1985); *People v. Trujillo*, 773 P.2d 1086, 1089 (Colo.1989).

█ An officer's subjective and unarticulated hunch that criminal acts have occurred will not support the reasonable suspicion requirement necessary for an investigatory stop. *People v. Wells*, 676 P.2d 698 (Colo.1984). Under certain conditions, however, a law enforcement officer acting on less than reasonable suspicion may briefly detain an individual without running afoul of protected constitutional rights. We recognized an example of such a stop in *People v. Rister*, 803 P.2d 483 (Colo.1990), when we declared that the state's substantial interest in preventing the loss of life and damage to property caused by drunk drivers permitted the minor inconvenience to highway travelers of a stop for the purpose of determining whether the operator of a motor vehicle was intoxicated and, therefore, did not constitute an unreasonable seizure.

[3] The state has a legitimate interest in protecting wildlife, and the General Assembly has enacted a series of laws to protect the state's interest and the constitutional rights of Colorado citizens. Wildlife officers are afforded the power and authority to arrest persons charged with violating state game laws. § 33–6–101(1), 14 C.R.S. (1984). A wildlife officer can demand the production of a license so long as the officer has reason to believe that a person is exercising or has exercised the benefits of a state hunting or fishing license. § 33–6–101(2), 14 C.R.S. (1984). Check stations are even permitted to aid in the management of wildlife and enforcement of the wildlife rules in certain circumstances. § 33–6–111(2), 14 C.R.S. (1984). Failure to stop at a check station is a criminal offense. § 33–6–111(2), 14 C.R.S. (1984).

Neither Wildlife Officer Holder nor Officer Crosby testified that they had established a check station on the weekend in question or that they had any reason to believe that the slow-moving vehicle had been involved in hunting or was in violation of the state wildlife laws. The conduct in question parallels that condemned in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), in that the Coca vehicle was stopped merely to see if it had been involved in the commission of a hunting infraction. Nothing that was known by the wildlife officers provided them with a reason to believe that a violation of the wildlife laws was occurring, had occurred, or was about to occur. *Compare People v. Contreras*, 780 P.2d 552 (Colo.1989) (anonymous tip of a car strip in progress that also described suspects' purple car, when corroborated by officers' observations of purple car and stripped car, provided specific and articulable basis to believe a crime had occurred) *with People v. Garcia*, 789 P.2d 190 (Colo.1990) (anonymous tip, even though corroborated by police observation, did not provide reason to suspect criminal activity since information corroborated was commonplace and unremarkable). The report that a shot was fired in an area that was open to hunting is no evidence that supports a stop. The observance of deer in the area where the shot was fired does not support Officer Holder's conclusion that Coca's Toyota truck should be stopped. Driving slowly with the lights on after dark on a mountain dirt road provides no basis for a stop. Here, the totality of the circumstances did not provide a reasonable and articulable basis to support the stop. *See People v. Mascarenas*, 726 P.2d 644 (Colo.1986); *People v. Hazelhurst*, 662 P.2d 1081 (Colo.1983). No testimony was elicited that this area had previously been asso-

ciated with incidents of illegal poaching or night hunting. Nothing, apart from Officer Holder's hunch, supported the stop.

Although a checkpoint had not been established, the trial court found that any vehicle coming down that road that evening would have been stopped. The trial court's findings are supported by the record and are sustained. *See People v. Hampton,* 758 P.2d 1344 (Colo.1988) ("[trial] court's factual findings are entitled to deference and will not be overturned if supported by competent evidence in the record"); *cf. People v. Raffaelli,* 647 P.2d 230 (Colo. 1982) (trial court's findings of fact supporting suppression of confession as involuntary will be upheld on review when supported by the record); *People v. Terry,* 538 P.2d 466, 189 Colo. 177 (1975) (reviewing court would not second guess trial judge's determination that evidence should be suppressed when supported by evidence in the record). There was no articulable and specific basis in fact for suspecting that criminal activity had occurred, was occurring, or was about to occur that would support the stop and search of the Coca vehicle on a remote road in Las Animas County.

Accordingly, we affirm the trial court's suppression order.

VOLLACK, J., dissents, and ROVIRA, C.J., and MULLARKEY, J., join in the dissent.

Justice VOLLACK dissenting:

The majority, in affirming the district court's ruling suppressing evidence, finds that there was no articulable and specific basis in fact supporting Officer Crosby's investigatory stop of the defendants. I disagree. A careful review of the record reveals that the requirements for an investigatory stop were satisfied, and thus the district court's ruling was not supported by the evidence.

I.

Officer Crosby has been employed by the Colorado Division of Wildlife as a Wildlife Technician for seven years. Officer Holder has been employed as a District Wildlife Manager by the same division for seventeen years. On November 10, 1990, Officers Holder and Crosby were assigned to Las Animas County. Since it was the last weekend of the combined deer and elk hunting season, Officers Holder and Crosby testified that they had been routinely checking hunters to verify whether weapons in vehicles were unloaded, whether the hunters possessed any game, and whether the hunters were properly licensed.[1]

At approximately 5:00 p.m., it was approaching darkness. Officer Holder was on Mavricio Canyon Road, a remote, dirt road running up into Mavricio Canyon. He had previously come into contact with some hunters who sought permission to enter private property and scout the next day's hunt. A few minutes later, Officer Holder came into contact with a vehicle driven by Barbara Gonzales. Ms. Gonzales told Officer Holder that her dog had been barking so she had stepped outside her residence. She heard a shot immediately thereafter. She asked Officer Holder if he knew whose vehicle was parked in a field near Mavricio Canyon Road. Ms. Gonzales had heard the shot approximately twenty minutes before contacting Officer Holder.

In response, Officer Holder contacted the hunters again and asked them if they had shot a deer or an animal. They said that they had not shot anything because it was night. One of the hunters said that he had seen a big truck, "like a Chevie truck," in the area.

At this point, Officer Holder contacted Officer Crosby by radio and told Officer Crosby that he was investigating a possible

---

1. Section 33–6–111(1), 14 C.R.S. (1986), provides that

    [a]ny person who hunts, traps, fishes, or possesses wildlife for any purpose shall produce all applicable licenses ..., all firearms, ... [and] all wildlife ... when requested to do so by a district wildlife manager or other

peace officer, as defined in section 33–1–102(32)[,] empowered to enforce articles 1 to 6 of this title.

    Subsection (2) of the same section gives the division an additional permissive authority to establish check stations to aid in the enforcement of wildlife regulations.

deer-poaching incident because he had report of a shot and that there were deer in the area. Officer Holder said that he would be following two sets of foot tracks onto Red Rocks Ranch and directed Officer Crosby to come stand by the entrance to the ranch. Officer Holder did not want anyone to pull in behind him while he was following the tracks on foot.

Officer Holder began to follow the two sets of tracks. While on the ranch, he had a view of Mavricio Canyon Road. He saw the headlights of a vehicle coming down the road very slowly, at about five to ten miles per hour. The slow rate of speed raised a suspicion in Officer Holder's mind because hunters sometimes "look[ ] for things along the road." Officer Holder contacted Officer Crosby a second time and directed him to stop the slowly moving vehicle, to see if it was part of the poaching incident that Officer Holder was investigating. Between Ms. Gonzales' report of the shot and Officer Holder's sighting of the slowly moving vehicle, Officer Holder had not seen any other vehicles on Mavricio Canyon Road.

After his first communication with Officer Holder, Officer Crosby positioned his vehicle approximately 120 yards from the junction of Mavricio Canyon Road and Apishapa Road. Approximately five to ten minutes passed between their first radio communication and Officer Holder's sighting of the vehicle. After their second communication, Officer Crosby drove to the junction of the two roads and activated his red and blue emergency flashing lights. The slowly moving truck eventually stopped after it passed Officer Crosby's vehicle.[2]

Officer Crosby approached the driver's window and asked if the two defendants "had any luck." Officer Crosby received no response. Officer Crosby asked if they had been hunting. The defendants replied that they had not. Officer Crosby noticed that the passenger had a .22 caliber rifle between his legs with the muzzle pointing up. He asked if he could check the rifle to verify that it was unloaded. Officer Cros-

by thought he saw the passenger remove the clip from the rifle before handing it to him.

While checking the rifle, Officer Crosby observed daylight blaze orange hunting apparel, hunting knives, and a second rifle behind the seat. He repeated his query whether the defendants had been hunting. They replied again in the negative. Officer Crosby returned the rifle to the passenger and asked if he could take a look in the back of the truck. The defendants said, "Okay."

Before moving away from the driver's door, Officer Crosby used his flashlight to illuminate the back of the pickup, which was covered with a camper shell. He noticed a tarp bundled in the back. Officer Crosby asked the driver what was in the tarp. The driver replied that there was nothing in the tarp. Officer Crosby asked for permission to look inside the tarp and the driver replied, "Okay." Officer Crosby went around to the back of the vehicle and opened a window at which point he could see feathers. He looked under a fold of the tarp and saw a turkey. He ascertained that it was recently killed as it felt warm to his touch.

## II.

It is well settled that peace officers may stop individuals for limited investigatory purposes having less than probable cause to arrest. *People v. Carillo–Montes*, 796 P.2d 970, 973 (Colo.1990); *People v. Lagrutta*, 775 P.2d 576, 579 (Colo.1989); *People v. Bell*, 698 P.2d 269, 273 (Colo.1985); *People v. Clements*, 665 P.2d 624, 625 (Colo.1983); and *Stone v. People*, 174 Colo. 504, 508–09, 485 P.2d 495, 497 (1971).

Such stops are consistent with the Fourth Amendment to the United States Constitution and article II, section 7, of the Colorado Constitution if the following three conditions are satisfied:

(1) the police officer must have an articulable and specific basis in fact, *i.e.*, a reasonable suspicion, for suspecting that criminal activity has occurred or is about

**2.** The vehicle stopped by Officer Crosby was a    Toyota truck.

to occur; (2) the purpose of the intrusion must be reasonable; and (3) the scope and character of the intrusion must be reasonably related to its purpose.

*Bell,* 698 P.2d at 272; *see also Carillo–Montes,* 796 P.2d at 973; *Lagrutta,* 775 P.2d at 576; and *Stone,* 174 Colo. at 509, 485 P.2d at 497. A court evaluating the legitimacy of an investigatory stop must consider the totality of the circumstances when evaluating whether the officer had a reasonable suspicion. *Carillo–Montes,* 796 P.2d at 973. The specific facts known to the officer, in addition to the rational inferences to be drawn from those facts, are critical. *Id.; see also Bell,* 698 P.2d at 272.

This court has employed six factors to aid its determination of the reasonableness of investigatory stops. *Bell,* 698 P.2d at 272 (finding reasonable suspicion for an investigatory stop of a vehicle). This court considers, among other things, the size of the area in which the offender might be found (including the elapsed time since the crime occurred), the number of persons in that area, the probable direction of the offender's flight, the observed activity of the person stopped, and the officer's suspicion that the vehicle stopped has been involved in some criminality of the type presently under investigation. *Id.* Application of the factors to the facts of this case clearly supports a finding of reasonable suspicion.

### A. Reasonable Suspicion

When Officer Holder spoke with Ms. Gonzales, darkness was approaching. She reported a shot twenty minutes earlier and that she had seen an unfamiliar vehicle in a field adjacent to Mavricio Canyon Road. Ms. Gonzales' residence was located on Mavricio Canyon Road approximately one quarter mile away from the point where she contacted Officer Holder.

Officer Holder knew that deer had been seen in the area. In response to Ms. Gonzales' information, he contacted the only hunters he had recently seen in the area.

They stated that they had not been hunting because it was dark. They also stated that they had seen another truck in the area. Based on his seventeen years of experience, Officer Holder decided to follow two sets of foot tracks that he saw in order to investigate what he determined was a possible deer poaching. He contacted officer Crosby for assistance. Shortly thereafter, Officer Holder saw headlights of a vehicle traveling extremely slowly· down Mavricio Canyon Road. This raised his suspicions.

He contacted Officer Crosby again, directing him to stop the vehicle. Officer Crosby also saw the vehicle travel slowly, approximately twenty to twenty-five miles an hour slower than the normal rate of speed for that road. Neither officer had seen other vehicles driving down Mavricio Canyon Road from the direction of Ms. Gonzales' property since the time of her complaint. Officer Holder did not inform Officer Crosby that the hunters reported seeing a big truck.[3] It was dark, however, when Officer Crosby first observed the truck slowly descending Mavricio Canyon Road.

Less than an hour elapsed between Ms. Gonzales' hearing of the shot and Officer Crosby's stop of the defendant's truck. No other vehicles had passed, and the vehicle observed was traveling at an unusually low rate of speed in the dark. Based on these facts and on his conversations with Officer Holder, Officer Crosby had reasonable suspicion to believe that a crime had occurred or was about to occur.

### B. Purpose of the Intrusion

Officer Crosby testified that he attempted to ascertain whether the defendants had been hunting and whether the rifle in the vehicle was unloaded. Section 33–6–111 requires people who hunt to produce all firearms and wildlife to peace officers upon their request. § 33–6–111(1), 14 C.R.S. (1984). Under the statute, the purpose of Officer Crosby's intrusion was patently reasonable.

---

**3.** The record does not reveal precisely when the hunters saw the truck. It is plausible that the hunters saw the truck in between their two conversations with Officer Holder, during either twilight or darkness.

## C. Scope and Character of the Intrusion

Officer Crosby testified that he inquired as to whether the defendants had been hunting. He requested the rifle pursuant to section 33–6–111(1). He thought he saw the passenger remove the clip from the rifle before delivering it to Officer Crosby. While examining the gun, knives and fluorescent apparel indicative of hunting were in his plain view. He asked again whether the defendants had been hunting. Officer Crosby testified that he thought that it was strange for a passenger to hold a rifle with the muzzle pointed up and to have hunting apparel and knives in the cab of the truck while not actively hunting. He asked and received permission to look in the back of the truck, where he eventually saw the wild turkey. The scope and character of the intrusion were closely related to the purpose of determining whether the defendants had any loaded weapons in the vehicle and whether they illegally possessed any wildlife, pursuant to section 33–6–111.

The three conditions requisite to determining that an investigatory stop is constitutional are met in this case. I cannot agree with the majority's finding that "the totality of the circumstances did not provide a reasonable and articulable basis" for Officer Crosby to have a reasonable suspicion that a crime had been committed or was about to be committed. Maj.op. at 387.

### III.

The majority cites no authority discussing the circumstances under which a peace officer may have reasonable suspicion to stop a vehicle wherein the occupants may have committed a hunting violation. The majority equates the facts presented in this case to those presented in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). In *Prouse*, a police officer stopped a vehicle even though he had not observed any traffic or equipment violations or any suspicious activity. *Id.* at 650, 99 S.Ct. at 1394. "The patrolman was not acting pursuant to any standards, guidelines or procedures pertaining to spot checks." *Id.* The patrolman in fact testified: "I saw the car in the area and wasn't answering any complaints so I decided to pull them off." *Id.* at 650–51, 99 S.Ct. at 1394.

This case is clearly distinguishable from *Prouse*. Officer Crosby did not testify that he pulled the defendants over because he had nothing better to do. He pulled the defendants over under the direction of Officer Holder and based on his own suspicions. Both officers had reason to believe that the defendants were engaged in suspicious activity when viewing the vehicle descend Mavricio Canyon Road at an abnormally slow rate of speed. Additionally, under section 33–6–111(1), peace officers are permitted to request production of applicable licenses, firearms, and game. *Prouse* is simply inapposite to the present case.[4]

### IV.

By affirming the district court in this case, the majority sets a standard that elevates the burden of proving reasonable suspicion to the much more demanding burden of proving probable cause to arrest. Based on the totality of the circumstances, Officer Crosby had reasonable suspicion and the investigatory stop was constitutionally permissible.

After finding the stop permissible, the evidence seized may be admitted as the result of a consensual search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (holding that searches conducted pursuant to

---

4. The majority states that "[n]o testimony was elicited that this area had previously been associated with incidents of illegal poaching or night hunting." Maj.op. at 387–88. The majority fails to state where such a finding is required in the test of reasonableness of an investigatory stop.

The majority also discusses the rationale underlying suspicionless stops and notes that check stations are permitted to enforce wildlife regulations. Maj.op. at 387. The majority notes that neither officer testified that he had established such a check station. I fail to see the relevance of this discussion in examining the reasonableness of Officer Crosby's conduct in stopping the defendant's vehicle under the facts of this case.

valid consent are constitutionally permissible); *People v. Milton,* 826 P.2d 1282 (Colo. 1992); and *People v. Thiret,* 685 P.2d 193, 201 (Colo.1984). Accordingly, I dissent.

I am authorized to say that Chief Justice ROVIRA and Justice MULLARKEY join in this dissent.