The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Clayton ELLINGTON, Defendant–Appellant.

No. 92SA241.

Supreme Court of Colorado, En Banc.

June 14, 1993.

Rehearing Denied July 6, 1993.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., John Daniel Dailey, Deputy Atty. Gen., Robert Mark Russel, First Asst. Atty. Gen., Roger G. Billotte, Asst. Atty. Gen., Appellate Section, Denver, for plaintiff-appellee.

David F. Vela, Colorado State Public Defender, David M. Furman, Deputy State Public Defender, Denver, for defendant-appellant.

Justice VOLLACK delivered the Opinion of the Court.

Appellant Clayton Ellington (Ellington) appeals from a district court order denying a motion to suppress evidence, and from a judgment of conviction requiring Ellington to pay a $2,000 drug offender surcharge. We separately consider each order.

### I.

■ Ellington contends that imposition of a surcharge pursuant to section 18–19–103, 8B C.R.S. (1992 Supp.), violates the proscriptions against ex post facto laws because the statute was not in effect when he committed offenses. We agree.

In *People v. Stead*, 845 P.2d 1156 (Colo. 1993), we concluded that a district court order requiring the defendant Timothy Stead to pay a surcharge pursuant to section 18–19–103 violated constitutional proscriptions against ex post facto laws. *Id.* at 1159. "[Timothy] Stead committed offenses on August 22, 1990." *Id.* The drug offender surcharge statute went into effect on July 1, 1991. § 18–19–103(1), 8B C.R.S. (1992 Supp.); *see Stead*, 845 P.2d at 1158 (discussing the drug offender surcharge statute). Referring to the date on which Stead's offenses occurred, we ruled that "[t]he drug offender surcharge statute was not annexed to the charged offenses on that date; accordingly, retroactive application of the statute to [Timothy] Stead makes more onerous the punishment for [Timothy] Stead's crime after its commission, in contravention of the · prohibitions against ex post facto laws." *Stead*, 845 P.2d at 1159.

In the present case, Ellington committed offenses on September 23, 1990, approximately one year prior to the July 1, 1991, effective date of section 18–19–103. Pursuant to our opinion in *Stead*, imposition of a surcharge violates the proscriptions against ex post facto laws on these facts.[1] We reverse the district court order imposing a surcharge.

### II.

■ Ellington contends that the district court erred by denying his motion to suppress evidence, and thus his convictions should be reversed. We disagree.

"[A] police officer may stop a person for investigatory purposes under narrowly defined circumstances without having probable cause to arrest." *People v. Carillo-Montes*, 796 P.2d 970, 973 (Colo.1990); *see People v. Contreras*, 780 P.2d 552, 555 (Colo.1989); *Stone v. People*, 174 Colo. 504, 485 P.2d 495 (1971). In such cases, " '(1) there must be an articulable and specific basis in fact for suspecting that criminal activity has taken place, is in progress, or is about to occur; (2) the purpose of the intrusion must be reasonable; and (3) the scope and character of the intrusion must be reasonably related to its purpose.' "

---

1. Since we find that the surcharge violates the proscriptions against ex post facto laws, we do not consider due process and equal protection challenges to the surcharge statute.

*Carillo–Montes*, 796 P.2d at 973 (quoting *Contreras*, 780 P.2d at 555).

"In determining whether an investigatory stop violated constitutional standards, the totality of the circumstances must be considered." *Contreras*, 780 P.2d at 555. "The facts known to the officer at the time of the stop and any reasonable inferences drawn from the facts must be considered." *Id.*

In the present case, the district court held a hearing on Ellington's motion to suppress evidence of a Beretta .22 caliber pistol and a pink plastic container containing one rock of suspected crack cocaine. Officer Phillip Dancy (Officer Dancy) testified that, prior to application for a search warrant of the Night Life Disco (the Disco), the Colorado Springs Police Department received twenty-two "calls related to violent crimes, assaults, robberies and shots, calls for service that detailed shots being fired in the parking lot and numerous drug transactions" occurring at the Disco. Officer Dancy established a stationary surveillance of the Disco, and established that narcotics transactions occurred there on a nightly basis. Officer Dancy, after submitting a twenty-five page affidavit detailing both the calls received and the results of the surveillance, obtained a warrant to search the Disco, the parking lot, and specific persons, for narcotics. According to Dancy, approximately thirty to fifty officers assisted in executing the search warrant on September 23, 1990.

Officer Mark Comte (Officer Comte) testified that, while executing the warrant at approximately 3:00 a.m., he was the only officer positioned outside of the front door of the Disco. Officer Comte detained Ellington directly in front of the Disco, which was the only business open at that time. Officer Comte directed Ellington to lie down on the ground with his hands visible. Officer Comte testified that "[a]t times it appeared that [Ellington] wanted to keep lowering his hands down toward his body." When a second officer arrived, Officer Comte conducted a pat-down search for weapons, and, as he checked the right side of Ellington's jacket, he felt an object in the pocket which he retrieved and discovered to be a .22 caliber semi-automatic weapon. Officer Comte then placed Ellington under arrest for carrying a concealed weapon, and conducted a search incident to a lawful arrest. Officer Comte subsequently found a plastic container in Ellington's shirt pocket which contained several rocks of suspected crack cocaine.

After the hearing, the district court issued a written order wherein the district court found that all the officers executing the warrant were "aware not only of generalized illegal activity regularly occurring upon the premises but also of frequent and specific instances of possession and discharge of firearms by the [Disco's] patrons in the three months preceding the execution of the Warrant." The district court found that,

> [b]ecause of the detail and specificity of the information known to the police officers at the time of the execution of the warrant, particularly those pieces of information pertaining to the possession and the discharge of firearms by patrons of the [Disco], a "pat-down" of the Defendant for weapons was constitutionally permissible.

A review of the affidavit and of the suppression hearing testimony reveals that there was an articulable and specific basis in fact for suspecting that criminal activity had occurred and was in progress. The purpose of the pat-down was reasonable: Officer Comte conducted a search for weapons at a location where there had been numerous reports of discharged weapons. Further, the scope and character of the intrusion was reasonably related to its purpose of searching for weapons. Based on the foregoing, we affirm the district court's denial of the motion to suppress, and remand the case for further proceedings consistent with this opinion.

LOHR, J., specially concurs, and KIRSHBAUM, J., and SCOTT, J., join in the special concurrence.

Justice LOHR specially concurring:

I agree with the majority's determination that the imposition of a surcharge against the defendant, Clayton Ellington, pursuant

to section 18–19–103, 8B C.R.S. (1992 Supp.), would violate the constitutional proscription against ex post facto laws. *See* maj. op. Part I, at 224. I also agree with its affirmance of the district court's decision not to suppress as evidence the pistol and the plastic container allegedly containing crack cocaine that were found in the defendant's pockets. *See id.* Part II, at 224–225. I write separately, however, to make clear that my conclusion that the district court's denial of suppression in this case was correct is based on that court's specific finding, which is supported by the record, that the officer who seized these items had "a reasonable suspicion to believe that persons within the establishment or though outside it, within a few feet from him, may have been armed and then presently dangerous" and that "[t]he Defendant was one of those people." A review of the record shows that the information set forth in the affidavit for a search warrant as well as the circumstances surrounding the execution of the warrant provided the police with "specific and articulable facts" to justify a reasonable suspicion that the defendant had been engaged in criminal activity and was armed and dangerous at the time, as the Fourth Amendment to the United States Constitution and Article II, Section 7, of the Colorado Constitution require to uphold an investigatory stop and search. *See Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); *People v. Carillo–Montes,* 796 P.2d 970, 973 (Colo.1990). I am therefore satisfied that the police conduct in this case was constitutionally permissible and that a denial of suppression is consistent with the United States Supreme Court's decision in *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979).

As the majority makes clear, in narrowly defined circumstances it is constitutionally permissible for a police officer to stop a person for investigatory purposes even if probable cause to arrest that person does not exist. Maj. op. at 224; *Carillo–Montes,* 796 P.2d at 973. In order to be constitutionally permissible, however,

> (1) there must be an articulable and specific basis in fact for suspecting that

criminal activity has taken place, is in progress, or is about to occur; (2) the purpose of the intrusion must be reasonable; and (3) the scope and character of the intrusion must be reasonably related to its purpose.

*People v. Contreras,* 780 P.2d 552, 555 (Colo.1989). Furthermore, an officer may conduct a weapons search of a person who has been stopped for investigatory purposes where the officer has a reasonable basis to believe that the person is armed and dangerous. *Terry,* 392 U.S. at 21–27, 88 S.Ct. at 1879–83. Such a search is characterized as "something less than a 'full' search" in that it is justified by and "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Id.* at 26, 88 S.Ct. at 1882. The validity of an investigatory stop and an ensuing search for weapons is assessed by evaluating the totality of the circumstances, giving consideration to the facts known to the officer at the time as well as any reasonable inferences that may be drawn from those facts. *See id.* at 21–22, 27, 88 S.Ct. at 1879–80; *Carillo–Montes,* 796 P.2d at 973.

In *Ybarra,* 444 U.S. 85, 100 S.Ct. at 338, the United States Supreme Court determined that a police officer's " 'cursory search for weapons' " of a customer who was on the premises of a tavern that was being validly searched pursuant to a warrant was an unconstitutional invasion of that person's Fourth and Fourteenth Amendment rights. The police in that case had obtained a warrant to search a tavern and a specifically named bartender for evidence of controlled substances and associated items. *Id.* at 88, 100 S.Ct. at 340. As the warrant was being executed, however, one of the officers conducted a pat-down search of the customers who were present in the tavern and found on the defendant, Ybarra, packets of a substance later identified as heroin. Evaluating the propriety of this action, the Court first determined that the police did not have probable cause to search the defendant at the time the warrant issued because the warrant application contained no allegation that tavern patrons

had ever purchased drugs. *Id.* at 90, 100 S.Ct. at 341. Thus, there was no basis for believing that any of the patrons would be violating the law. Nor did probable cause arise when the police conducted their search of the tavern, for the defendant gave them no reason to believe that he either had committed or was committing a crime. *Id.* at 90–91, 100 S.Ct. at 341–42. As the Supreme Court determined, "the agents knew nothing in particular about Ybarra, except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale." *Id.* at 91, 100 S.Ct. at 342. It then made clear that at least when the probable cause standard is at issue, "a search or seizure of a person must be supported by probable cause *particularized with respect to that person.*" *Id.* (emphasis added).

The Court then proceeded to assess the constitutionality of the search under *Terry,* and concluded that the absence of a reasonable basis for believing that the defendant was armed and presently dangerous precluded justifying the search by reliance on that doctrine. *Id.* at 92–93, 100 S.Ct. at 342–43. As the Court stated, "[t]he 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion *directed at the person to be frisked,* even though that person happens to be on premises where an authorized narcotics search is taking place." *Id.* at 94, 100 S.Ct. at 343 (emphasis added). Because the prosecution could not articulate any specific fact to justify an officer in even suspecting that this particular defendant was armed and dangerous, the Court found the search constitutionally invalid. *Id.* at 93, 96, 100 S.Ct. at 343, 344. *See also Carillo–Montes,* 796 P.2d at 974 (upholding trial court's determination that police officers lacked reasonable suspicion to believe that a defendant who was merely a passenger in a car parked on a street in front of a house that the officers had a warrant to search was engaged in illegal behavior and that the investigatory stop of this defendant was illegal).

Although *Ybarra* arose in a situation bearing some similarities to the case now before us, the record shows that the circumstances surrounding the application for and execution of the search warrant in this case provided specific and articulable facts from which the police could reasonably suspect that the defendant either had been or was then engaged in criminal activity and that he was armed with a weapon at the time so as to justify the investigatory stop and search. The record shows that in the six months preceding their application for a warrant to search the Night Life Disco, police had received over twenty calls based on complaints of illegal activities occurring at the business and in its parking lot. These included reports of illegal liquor sales, gambling, and prostitution, as well as several fights, assaults, and gun shots. Some of the reports specifically identified patrons of the business. The police therefore instituted an intensive investigation of the disco on August 24, 1990, that included undercover operations, use of a confidential informant, and surveillance of the premises. During this investigation, officers observed on a nightly basis persons who were known prostitutes and narcotics dealers coming in and out of the disco and either using drugs or transacting drug sales in the parking lot. They also routinely witnessed illegal gambling and liquor sales on the premises, documented instances of gunfire, and established independent assault, robbery, and prohibited use of weapons cases against a number of the disco's customers. This information was then used to obtain a warrant from the El Paso County District Court on September, 21, 1990, authorizing a search of the disco and several specified persons likely to be found at that location.

The police executed the warrant at about 3:00 a.m. on September 23, 1990. At approximately 1:00 a.m. on that morning they set up surveillance of the disco and witnessed the same types of narcotics activity that had been occurring over the previous months. This surveillance continued for approximately two hours, after which the officers prepared for their surprise entry of the building. As they prepared, howev-

er, the officers were detected by a person in the parking lot who proceeded to alert others that there was going to be a raid. As a result, the police had to execute the warrant prematurely and with approximately one-half of the personnel that they originally intended to employ. At the suppression hearing, the officer who applied for the warrant testified that not only did this exigency in itself create an emergency situation that increased concern for officer safety, but that this concern was heightened in light of the previous instances of gun-related activities occurring on the premises.

When the police proceeded to enter the disco, the defendant was found standing by the entrance with two other men. Officer Comte, the officer who remained outside of the disco in order to secure that portion of the building, immediately had these men lie down and, after another officer arrived, conducted the pat-down search that revealed the defendant's weapon. Officer Compte testified at the hearing that because of the positioning of these three men, the fact that the search was occurring at approximately 3:00 a.m. in a dimly lit parking lot of the only business that was open at the time, and considering the history of violence at the disco, he had to assume that these men were armed, and that he therefore detained and searched them so as to ensure his own safety as well as that of the other officers.

The district court agreed that Officer Comte had a reasonable suspicion that the defendant was armed and presently dangerous. It stated that based on

> the detail and specificity of the information known to the police officers at the time of the execution of the warrant, particularly those pieces of information pertaining to the possession and the discharge of firearms by patrons of the [disco], a "pat-down" of the Defendant for weapons was constitutionally permissible.

Because the record clearly shows that the officers' prior investigations revealed a significant amount of violent criminal activities occurring in the disco's parking lot and

that the circumstances surrounding the execution of the warrant increased the potential that a person who was found on the premises at the same time and in the same position as the defendant possessed weapons and posed serious danger to the police, I also agree that there are specific and articulable facts to support a reasonable suspicion that the defendant was armed and dangerous. In light of this particularized suspicion, I find this case distinguishable from *Ybarra* and conclude that the investigatory stop and pat-down search were constitutionally permissible. I therefore concur with the majority's affirmance of the district court's order denying the motion to suppress the evidence in this case.

KIRSHBAUM and SCOTT, JJ., join in this special concurrence.